In the

# United States Court of Appeals
## For the Seventh Circuit

Nos.  99-1492, 99-3533, 99-3569
99-3570, 99-3623

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BAHMAN MANSOORI, MARK COX,
MOHAMMAD MANSOORI,
KENNETH CHOICE, and TERRY YOUNG,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 63—**George W. Lindberg**, *Judge*.

ARGUED NOVEMBER 8, 2000—DECIDED AUGUST 29, 2002

Before BAUER, ROVNER, and DIANE P. WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge*. Appellants Kenneth Choice, Mark Cox, Bahman Mansoori, Mohammad Mansoori, and Terry Young were collectively convicted of conspiracy to possess with intent to distribute cocaine, cocaine base and heroin. Cox and Young were also convicted of possession of cocaine with the intent to distribute; Mohammad Mansoori was convicted of engaging in monetary transactions involving funds derived from criminal activity; and Young

was convicted of money laundering. We affirm the appellants' convictions but, based on certain errors at sentencing, vacate their sentences and remand for re-sentencing in conformity with this opinion.

## I.

On October 31, 1996, a drug transaction many months in the planning finally came to pass. Several members of the Chicago street gang, Traveling Vice Lords ("TVL"), who were engaged in narcotics trafficking had organized a drug deal that, unbeknownst to them, would be captured on recorded telephone conversations obtained through court-authorized wiretaps. On that date, TVL leader Terry Young had arranged for TVL member Timothy White to purchase a kilogram of cocaine for resale from Mark Clemons. Young's right-hand man, Kenneth Choice, was assigned to transfer the cocaine from White to another TVL member, Terry Bronson, who would keep it until Mark Cox came to pick it up for resale on the street. Once Bronson was in possession of the cocaine, the police began to follow his car. A chase ensued that finally ended with Bronson crashing his car into a garage and fleeing the scene of the accident without the cocaine, which the police officers seized. Arrests of the individuals who had participated in the narcotics trafficking ensued.

The evidence at trial revealed that each of the appellants participated in a conspiracy to distribute narcotics in a different capacity. Mohammad Mansoori was not a member of TVL, but along with his brother, Bahman, distributed drugs and guns to Young. Young, Cox, and Choice were all members of TVL. They used the gang to plan highly organized drug transactions that culminated in street-level sales of cocaine and heroin at locations controlled by the gang. Young, a high-ranking TVL member, was in charge of the drug sales. Young obtained drugs and guns from Mohammad and Bahman Mansoori and then distributed

both (the drugs for resale, and the firearms for protection) among various members of the gang. He assigned other gang members to certain locations where they carried out their sales. Choice worked directly for Young within the gang, picking up and delivering drugs for various TVL members. Cox also worked directly under Young, managing a large area of drug distribution locations.

Both Mohammad Mansoori and Young purchased property with earnings from the drug enterprise. Mansoori made several large cash payments to contractors for a house he was having built in Highland Park. He had confessed to an accountant and an IRS agent that he did not receive any money from his legitimate enterprises. The police had also stopped Mansoori and seized about $11,000 in cash made from a suspected drug transaction. Young had purchased a house through a nominee purchaser, Lovell Nabors. Although Nabors signed a lease with purchase option for the house, he used Young's money to make the purchase and understood that the house was actually Young's. An IRS agent testified that he did not think that Young could have purchased the property with his legitimate sources of income.

The jury convicted appellants of all charges, and this appeal arises from the convictions and the lengthy sentences that the district court imposed pursuant to those convictions.

## II.

A.  Wiretap Order

On four occasions in late 1996 and early 1997, then-Chief Judge Marvin Aspen of the Northern District of Illinois entered orders authorizing the government to monitor various telephone numbers which, the government believed, the defendants were using to conduct their narcotics business. The orders indicated that the conversations inter-

cepted from these telephone numbers were expected to reveal:

(1)  the identities of individuals possessing with intent to distribute and distributing controlled substances;

(2)  the locations where the controlled substances were distributed and stored;

(3)  the methods by which the controlled substances were distributed and drug proceeds are distributed;

(4)  the dates, times and manner of the transportation, receipt, storage, distribution and delivery of the controlled substances and proceeds;

(5)  the nature and scope of the conspiracy; and

(6)  the identities and roles of unidentified conspirators.

Appellants' Joint Appendix ("App.") 228-29, 237-38, 245-46, 254. Each order also compelled the government to minimize (i.e., limit) the interception of conversations that did not relate to the government's investigation.

> Monitoring of wire conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. . . .

App. 232, 241, 248-49, 257; *see* 18 U.S.C. § 2518(5). Conversely, however, the orders also permitted the individual monitoring to spot check any minimized conversation to ensure that the participants had not turned their discussion to illicit matters within the scope of the investigation.

("If the conversation is minimized, the monitoring individual shall spot check to ensure that the conversation has not turned to criminal matters."). App. 232, 241, 249, 257-58.

Pursuant to these orders, the government intercepted more than 3,500 telephone conversations. In order to determine whether a given conversation fell within the scope of the intercept order or instead concerned matters unrelated to the investigation, the government would initially intercept the conversation for a period of two minutes. If the monitoring individual determined that the conversation was beyond the scope of authorized surveillance, the interception would cease at the end of the two-minute period in compliance with the minimization requirement of the wiretap orders.[1] However, if that conversation lasted for more than another minute or so, the monitoring individual would re-intercept the conversation and perform a follow-up spot check to confirm that the conversation had not progressed into the scope of authorized surveillance. In practice, this meant that all telephone calls under two minutes in length were intercepted (whether relevant to the investigation or not) and that one or more two-minute segments of longer conversations were also intercepted, even when those conversations were irrelevant to the investigation. A summary prepared by the government indicates that of all the calls intercepted: 565 conversations were identified as criminal in nature and so were not minimized; 1,791 conversations were not pertinent to the investigation but were not minimized because they lasted no more than two minutes; and another 366 were not pertinent and exceeded two minutes in length, and of these

---

[1] During minimization periods, the monitoring agent would stop recording the conversation and turn the sound off in the interception device.

nearly all (362) were minimized. R. 267 at 21.[2]

In advance of trial, the defendants moved to suppress all of the intercepted conversations, contending that the government had not complied with the minimization requirement and, as a result, had unnecessarily and inappropriately eavesdropped on a number of conversations that were beyond the scope of its investigation. Judge Lindberg denied the motion. Although the judge agreed that the government had intercepted a number of conversations, or portions of conversations, that were beyond the scope of the wiretap orders, he did not believe that the government's agents had listened to more of the conversations than necessary in order to determine that they were irrelevant:

> [I]t is understandable that a fair amount of material not pertinent to the investigation wound up being intercepted in this investigation. Many of the conversations were under two minutes in length, and so did not require minimization. The individuals conversing often did so in an ambiguous, guarded, and possibly coded manner so that more of the conversations had to be intercepted to later sort out what in fact they were talking about. The Government had evidence that defendant Terry Young was the head of a major drug ring justifying more extensive interception. And the authorizing judge was supervising the electronic surveillance in an ongoing manner, receiving reports on it at ten day intervals.

R. 335 at 2. At trial, the government introduced approximately 300 of the tape recordings into evidence. Because these recordings captured the defendants discussing nar-

---

[2]  These subtotals do not include certain intercepted communications, including calls that were placed to pagers, calls in which the intended recipient was not reached, and conversations that took place in Farsi.

cotics transactions, they proved to be some of the most direct and damning evidence in the prosecution's arsenal.

On appeal, the defendants initially argue that the wiretap orders, by virtue of the provision allowing periodic spot checks of any minimized conversation "to ensure that the conversation has not turned to criminal matters," violated their statutory and constitutional rights. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, includes a mandate that "[e]very [intercept] order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." 18 U.S.C. § 2518(5). Although the intercept orders in this case included a minimization requirement, the defendants believe that this provision of the orders was rendered virtually meaningless as a result of the orders' additional provision that "the monitoring individual *shall* spot check to ensure that the conversation has not turned to criminal matters." App. 232, 241, 249, 257-58 (emphasis added). They find the spot-check provision problematic in two respects: (1) the provision imposed no limits on the frequency or duration of spot checks; and (2) because the provision referred broadly to "criminal matters" rather than to the specific criminal activities for which Judge Aspen had authorized interception, the orders permitted the government to check each and every minimized conversation for any discussion of criminal activity, even criminal activity that was unrelated to the government's investigation.

Because the defendants did not make this particular challenge below, our review is for plain error alone, *see United States v. Williams*, 272 F.3d 845, 854-55 (7th Cir. 2001), *cert. denied*, 122 S. Ct. 1339 (2002), and we find no such error in the terms of the order. Express limits on the frequency and duration of spot checks may well be impractical, as neither the government nor the authorizing court

can know in advance how easy it will be for the monitoring agent to discern whether any given intercepted conversation concerns a subject within the scope of the investigation or not. A conversation may be short and to the point or long and meandering; and a conversation may begin on a non-pertinent topic but switch to a pertinent subject in short order. Use of code language, which as the district judge recognized is common among narcotics traffickers, can make quick assessments of the pertinence of a conversation difficult. So we cannot say that Judge Aspen erred when he refrained from placing a one-size-fits-all limitation on either the frequency or duration of follow-up spot checks or that Judge Lindberg plainly erred when he declined to suppress the results of the surveillance for want of such a limitation. Nor do we think that the provision's generalized reference to "criminal matters" plainly rendered the spot-check provision overbroad. When read in context with the other terms of the wiretap orders, that language did not give the government license to monitor all minimized conversations for *any* mention of criminal activity, whether related to the investigation or not. The orders specifically identified the type of evidence that the authorized intercepts were intended to capture. App. 228-29, 237-38, 245-46, 254. Furthermore, the orders required the government to stop monitoring a conversation "immediately" if the conversation turned out not to constitute "communications subject to interception under [Title III.]" App. 232, 241, 248, 257. The orders also acknowledged that Title III allowed for the interception and disclosure only of "those communications relevant to the pending investigation . . . ." App. 232, 241, 248, 257. Indeed, the government's instructions to its monitoring agents noted that "[w]e do not have authorization to overhear evidence concerning the commission or planning of crimes other than those [specified previously in the instructions] as illegal activities." R. 267 Ex. A at 7; *see also id.* at 3-4 (specifying illegal activities as to which interception permitted). Notwithstanding the language of

the spot-check provision, then, the overall terms of the orders made reasonably clear that the government was permitted to check intercepted conversations solely for discussions pertinent to the government's investigation, the nature and scope of which the face of the orders made clear. Any impermissible overbreadth in the spot-check provisions of the orders was not plain.

The defendants' second challenge focuses on the adequacy of the government's efforts to comply with the minimization requirement. What the minimization requirement means, essentially, is that once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she must stop monitoring that communication if it does not appear relevant to the government's investigation. In this case, the government's instructions to the monitoring agents indicated that they could listen to all calls involving one of the individuals named in the instructions "for a reasonable time, usually not in excess of two minutes, to determine whether the conversation concerns criminal activities." *Id.* at 5.[3] In practice, the agents monitored the entirety of all calls under two minutes in length (some 1,791 calls, 103 of which were in Farsi). Moreover, calls in excess of two minutes that were deemed non-pertinent after the initial two-minute assessment were, per the instructions, periodically reassessed (again for up to two minutes at a time) at intervals of at least one minute. *Id.* at 5-6. So, theoretically, an agent could listen to the first two minutes of a conversation, decide it was non-pertinent, turn off the listening and recording devices for a minute, then turn them back on and listen to the conversation for another two minutes, and so on—and in this way

---

[3] The instructions authorized agents to listen to a conversation for a period longer than two minutes if the nature of the conversation was not entirely clear but was possibly related to the subject of the investigation. *See* R. 267 Ex. A at 5.

monitor as much as two-thirds of a non-pertinent conversation.[4] The defendants argue that because the government's agents listened to each call for a period of two minutes to determine initially whether or not the conversation fell within the scope of the wiretap orders, and because they performed periodic, two-minute spot-checks on minimized calls, there was no real minimization in practice.

A court assessing the sufficiency of the government's efforts in this regard must ultimately decide whether the steps that agents have taken to minimize the interception of communications unrelated to the investigation were objectively reasonable given the circumstances confronting the agents. *See Scott v. United States*, 436 U.S. 128, 137, 98 S. Ct. 1717, 1723 (1978). Although the adequacy of the government's minimization efforts necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts. *United States v. Quintana*, 508 F.2d 867, 874-75 (7th Cir. 1975); *see also United States v. Charles*, 213 F.3d 10, 22 (1st Cir.), *cert. denied*, 531 U.S. 915, 121 S. Ct. 272 (2000); *United States v. Bankston*, 182 F.3d 296, 307 (5th Cir. 1999), *judgment rev'd on other grounds by Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365 (2000); *United States v. Williams*, 109 F.3d 502, 507 (8th Cir.), *cert. denied*, 522 U.S.

---

[4] The instructions did indicate that if conversations between the subject and one or more other individuals were invariably innocent, then subsequent conversations involving those conversations should no longer be monitored or recorded even on a spot basis. *See* R. 267 Ex. A at 6 ¶ 10.

917, 118 S. Ct. 303 (1997). "[W]here an investigation involves a drug ring of unknown proportion, as in this case, 'the need to allow latitude to eavesdroppers is close to its zenith.'" *Charles*, 213 F.3d at 22, quoting *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987). We review the district court's minimization assessment for clear error. *United States v. Moody*, 977 F.2d 1425, 1433 (11th Cir. 1992), *cert. denied*, 507 U.S. 1052, 113 S. Ct. 1948 (1993); *Bankston*, 182 F.3d at 306.

We are not inclined to view the government's overall approach to minimization in this case as insufficient. The government was investigating what the district judge described as a "major drug ring." R. 335 at 2. Narcotics traffickers are often aware that their conversations might be overheard or intercepted, and so may choose their words carefully. In this case, Judge Lindberg found that "[t]he individuals conversing often did so in an ambiguous, guarded, and possibly coded manner . . . ." *Id.* Consequently, the individuals monitoring such conversations cannot be expected to make snap judgments as to whether the subject of the conversation is within the scope of the intercept order. *See Quintana*, 508 F.2d at 874 ("It is all well and good to say, after the fact, that certain conversations were irrelevant and [monitoring] should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take.") (internal quotation marks and citations omitted). A number of other courts have found that two to three minutes is a reasonable period of time within which to make an initial judgment as to the pertinence of a conversation. *See United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir.), *cert. denied*, 516 U.S. 871, 116 S. Ct. 193 (1995); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992); *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989); *United States v. Losing*, 560 F.2d 906, 909 n.1 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S. Ct. 516 (1977); *United States v. Armocida*, 515 F.2d 29, 45 (3d Cir.),

*cert. denied*, 423 U.S. 858, 96 S. Ct. 111 (1975); *see also Bynum v. United States*, 423 U.S. 952, 954, 96 S. Ct. 357, 358 (1975) (Brennan, J., dissenting from denial of *certiorari*) (noting that brief calls—apparently those of less than three minutes in duration—will generally not be subject to minimization). Moreover, because conversations among traffickers, as among others, may bounce among a variety of topics, periodic spot-checking of minimized conversations is not unreasonable either. *See Ozar*, 50 F.3d at 1448. Thus, the general parameters under which the government conducted the monitoring here were not inherently suspect. Moreover, we note that the government in the course of its electronic surveillance submitted periodic reports to Judge Aspen, a circumstance that suggests it conducted the surveillance in good faith. *See Quintana*, 508 F.2d at 875.

But whether, in practice, the government's actual minimization efforts were sufficient is not a point that we need to resolve, ultimately. The adequacy of the government's minimization efforts typically cannot be determined in a generalized fashion. *See Scott*, 436 U.S. at 140-41, 98 S. Ct. at 1724-25. Yet the defendants have framed their challenge in very broad terms. They appear to suggest, for example, that it was unreasonable for monitoring agents to listen to *all* calls for an initial two-minute period, apparently on the assumption that a speedier assessment as to the pertinence of the calls was possible in at least some instances. And, indeed, perhaps some of the intercepted conversations did lend themselves to simple and quick categorization as pertinent or non-pertinent, while others required a full two minutes or more to assess. *See id.* at 140-43, 98 S. Ct. at 1724-26; *cf. Quintana*, 508 F.2d at 874 (if a pattern of innocent conversations emerges, agents should cease monitoring such conversations; but such patterns will not always be identifiable). The point is, however, that we cannot know whether this is true without examining at least a sampling of the intercepted calls. Likewise, whether the agents performed spot checks at intervals that were too

frequent, and whether they listened for too long when they made those checks, is not a question that can be answered responsibly in the abstract. If, after a review of the intercepts, the defendants believed that the government's eavesdropping was too intrusive and that a greater degree of minimization was warranted, then it was incumbent upon them to identify at least a sample of intercepted calls that proves their point. This they have not done. If the defendants were to prevail on their challenge, the appropriate relief likely would be to suppress any conversation or conversations that were inappropriately monitored. *See* 18 U.S.C. § 2518(10)(a)(iii); *Charles*, 213 F.3d at 22 (partial suppression of those conversations intercepted improperly is the usual remedy for inadequate minimization efforts; wholesale suppression of all intercepted conversations is reserved for the "particularly horrendous case"), quoting *Hoffman*, 832 F.2d at 1309; *Ozar*, 50 F.3d at 1448; *see also United States v. Baltas*, 236 F.3d 27, 32 (1st Cir.), *cert. denied*, 532 U.S. 1030, 121 S. Ct. 1982 (2001); *United States v. Dorfman*, 542 F. Supp. 345, 394-95 (N.D. Ill. 1982), *judgment aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S. Ct. 1354, 1355 (1985). Judge Lindberg pointed out that the defendants had not identified any particular conversation that should have been minimized but was not or that should have been minimized to a greater degree than it was. R. 335 at 2. Even on appeal, the defendants do not identify any such conversation. Nor do the defendants identify any concrete harms resulting from the admission of conversations which, in their view, should have been suppressed for want of appropriate minimization. Consequently, we have been deprived of the requisite basis for assessing the government's minimization efforts. For that reason, we need not, in the end, reach the merits of the minimization argument.

B. Anonymous Jury

On the government's motion, and over the defendants' objections, the district court decided not to disclose the names or the home and work addresses of prospective and empaneled jurors to the parties, the public, or the media—a step that resulted in an anonymous jury. Judge Lindberg had initially denied the government's request for juror anonymity, remarking that he did not "see any need for it." R. 750, 1/12/98 Transcript ("Tr.") 27. After entertaining further argument on the matter, however, the judge acceded to the request. He cited the following circumstances in support of his ruling: (1) the defendants were involved in organized, violent street crime that had "elements of what is traditionally called organized crime," (2) with access to some 200 firearms, the defendants had the "capacity to harm jurors," (3) allegedly, some of the witnesses and their families had been threatened, (4) the defendants were subject to lengthy terms of incarceration and stiff monetary penalties if convicted, and (5) there would likely be press coverage—"perhaps not extensive, but significant, publicity"—regarding the case. *Id.* at 116-17. "So it's not the fact that it's a drug case or a firearms case," the judge explained, "but it is the fact that there appears to be organized activity on the part of the defendants and their associates and families that warrants the prophylaxis of juror anonymity." *Id.* at 117-18. Shortly before jury selection commenced, Judge Lindberg disavowed any reliance upon threats against witnesses and their families, explaining that his principal concerns about the prospect of interference with jurors were based on his experience with another trial involving the Gangster Disciples, a gang unrelated to the Traveling Vice Lords. R. 754-1, 1/20/98 Tr. at 6. This left the organized-crime aspect of the case as the sole basis for the court's decision

in favor of juror anonymity.[5]

In the midst of jury selection, defendant Young's counsel asked the court to give the members of the venire an instruction indicating that their names and addresses were being withheld for reasons other than their own safety, so as to allay any suspicions among prospective jurors that their anonymity might otherwise arouse and to thereby minimize the potential prejudice to the defendants. *See United States v. Crockett*, 979 F.2d 1204, 1216-17 (7th Cir. 1992), *cert. denied*, 507 U.S. 998, 113 S. Ct. 1617 (1993). The court agreed to give an instruction to the effect that the jurors' identifying information was being withheld in order to prevent the media from contacting them. R. 754-3, 1/22/98 Tr. 380. However, when the full venire was assembled for final questioning, the judge neglected to give the instruction, and the parties did not remind him to do so.

The defendants argue now, as they did below, that the circumstances confronting the court did not warrant an anonymous jury and that the court therefore abused its discretion in empaneling such a jury. Noting that the district court also failed to deliver an appropriate ameliorative instruction, they contend that the defense was so prejudiced by the anonymity as to necessitate a new trial. Although we agree that the court abused its discretion in empaneling an anonymous jury, *see United States v. DiDomenico*, 78 F.3d 294, 301 (7th Cir.), *cert. denied*, 519 U.S. 1006, 117 S. Ct. 507 (1996) (decision to empanel anonymous jury reviewed for abuse of discretion), in view of the district court's careful voir dire of prospective jurors and the overwhelming

---

[5]   In support of its request for an anonymous jury, the government asserted that Young previously had "cloned" a pager belonging to a Chicago gang crimes specialist in an effort to determine whether the officer was investigating him and to ascertain the identities of the officer's informants. App. 266. Judge Lindberg never relied upon this allegation as the basis for an anonymous jury.

evidence of the defendants' guilt, we find the error harmless.

Empaneling an anonymous jury is an extreme measure that is warranted only where "'there is strong reason to believe the jury needs protection.'" *Crockett*, 979 F.2d at 1215, quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2nd Cir. 1991), *cert. denied*, 505 U.S. 1220, 112 S. Ct. 3029 (1992). "An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994), *cert. denied*, 515 U.S. 1132, 115 S. Ct. 2558 (1995); *see also United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996); *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir.) (per curiam), *cert. denied*, 516 U.S. 998, 116 S. Ct. 539 (1995); *United States v. Scarfo*, 850 F.2d 1015, 1023-26 (3rd Cir.), *cert. denied*, 488 U.S. 910, 109 S. Ct. 263 (1988); *United States v. Thomas*, 757 F.2d 1359, 1363-65 (2nd Cir. 1985), *cert. denied*, 474 U.S. 819, 106 S. Ct. 66, 67 (1985), and *cert. denied*, 479 U.S. 818, 107 S. Ct. 78 (1986). Juror anonymity also deprives the defendant of information that might help him to make appropriate challenges—in particular, peremptory challenges—during jury selection. *DiDomenico*, 78 F.3d at 301; *Edmond*, 52 F.3d at 1090.

> Yet, neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and courtroom security so long as steps are taken to ensure that the defendant receives a fair trial.

*Id.* A court weighing the need for an anonymous jury must therefore balance the defendant's interest in preserving the presumption of innocence and in conducting a useful voir dire against the jurors' interest in their own security and the public's interest in having a jury assess the defendant's

guilt or innocence impartially. *United States v. Amuso*, 21 F.3d 1251, 1264 (2nd Cir.), *cert. denied*, 513 U.S. 932, 115 S. Ct. 326 (1994); *accord Edmond*, 52 F.3d at 1090. Factors bearing on the propriety of an anonymous jury include the defendant's involvement in organized crime; his participation in a group with the capacity to harm jurors; whether he previously has attempted to interfere with the judicial process; the severity of the punishment that the defendant would face if convicted; and whether publicity regarding the case presents the prospect that the jurors' names could become public and expose them to intimidation or harassment. *Sanchez*, 74 F.3d at 564, quoting *United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995), *cert. denied*, 516 U.S. 1136, 116 S. Ct. 963 (1996); *United States v. Darden*, 70 F.3d 1507, 1532-33 (8th Cir. 1995), *cert. denied*, 517 U.S. 1149, 116 S. Ct. 1449 (1996), and *cert. denied*, 518 U.S. 1026, 116 S. Ct. 2567 (1996); *Edmond*, 52 F.3d at 1091; *Ross*, 33 F.3d at 1520.

We do not believe that the circumstances in this case warranted an anonymous jury. Although the case did involve elements of organized crime, "something more" than the organized-crime label is required in order to justify juror anonymity. As we explained in *Crockett*:

> "[S]omething more" can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendant[ ] and his associates such as would cause a juror to reasonably fear for his own safety.

979 F.2d at 1216, quoting *United States v. Vario*, 943 F.2d 236, 241 (2nd Cir. 1991), *cert. denied*, 502 U.S. 1036, 112 S. Ct. 882 (1992). In this case, the district court made no finding that the defendants had a history of intimidating witnesses or otherwise obstructing justice or that they were likely to do so in connection with this trial. *Cf. DiDomenico*, 78 F.3d at 301-02 (defendants were connected to organized

crime syndicate that had history of bribery and intimidation); *Edmond*, 52 F.3d at 1091-92 (one of defendants in narcotics conspiracy prosecution was also charged with murder, other defendants were implicated in that murder as well, and there was some evidence of planned and attempted witness intimidation); *Crockett*, 979 F.2d at 1216 (evidence indicated that one potential witness had been murdered and that attempts had been made to influence or intimidate other witnesses). True, the defendants may have had the ability to intimidate jurors through associates who were not incarcerated, but that is true of many defendants. What demonstrates the need for jury protection is not simply the means of intimidation, but some evidence indicating that intimidation is likely. *See, e.g., Darden*, 70 F.3d at 1532-33; *Ross*, 33 F.3d at 1520-21; *Vario*, 943 F.2d at 240, 241. No such evidence is present here. Nor is there evidence that the defendants had engaged in a pattern of violence unusual enough to cause jurors to fear for their safety. *Compare, e.g., Amuso*, 21 F.3d at 1264-65 (indictment alleged that defendant was responsible for crimes of extreme violence, including murders of government witnesses). Although the narcotics conspiracy in this case embraced a large-scale, gang-related operation with ready access to firearms, this is regrettably not uncommon in the drug trade. *See, e.g., United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000) ("guns are common in the drug trade"). The government has pointed to no evidence of violence of such a degree as to make this case unusual. The publicity surrounding the case was by no means extensive. Similarly, the fact that the defendants faced lengthy prison terms if convicted is hardly unusual—this is almost always true when a defendant has dealt in large quantities of narcotics. In short, that the defendants had the ability and incentive to threaten jurors, without additional evidence indicating that they were likely to act on that ability and incentive, was not enough to justify the unusual step of juror anonymity.

After a complete review of the record, however, we conclude that the error was harmless. We recognize that the Fifth Circuit has suggested that an erroneous decision to empanel an anonymous jury is not harmless where almost none of the pertinent factors supported that decision, but in so opining, that court left open the possibility that a harmless error analysis might be appropriate in a closer case. *Sanchez*, 74 F.3d at 565. Notwithstanding our disagreement with the district court's decision, we believe this to be a closer case than our colleagues on the Fifth Circuit confronted in *Sanchez*. The conspiracy charged in this case did take on elements of organized crime; the defendants and their unindicted co-conspirators did use weapons and violence in furtherance of the conspiracy; the defendants faced very long prison terms upon conviction; and there had been some pre-trial publicity regarding the case. Although these circumstances were not, by themselves, sufficient to justify an anonymous jury, they demonstrate that the record was by no means devoid of a basis for concern for the security of the jurors. At the same time, Judge Lindberg conducted an extremely thorough voir dire of prospective jurors in this case over the course of three and one-half days. Juror anonymity is most concretely felt during the selection of the jury, when the withholding of identifying information makes it more difficult for the defense (and for that matter the prosecution) to make intelligent decisions as to which prospective jurors should be challenged or stricken peremptorily. *See DiDomenico*, 78 F.3d at 301; *Crockett*, 979 F.2d at 1216. A conscientious voir dire compensates for this disadvantage by rooting out biases against the defendant or as to the issues presented in the case. *Id.* at 1216; *see also Edmond*, 52 F.3d at 1092-93; *Ross*, 33 F.3d at 1520. The defendants have identified no aspect in which the district court's voir dire was wanting, and our own review of the trial transcript satisfies us that the voir dire was "searching and thorough." *Crockett*, 979 F.2d at 1216. In this way, the defendants' right to an unbiased jury was

protected. Moreover, the court's instructions to the jury during both voir dire and the trial emphasized that the defendants were presumed innocent and that the government bore the burden of proving them guilty beyond a reasonable doubt. *See Crockett*, 979F.2d at 1216; R. 350 at 5 ¶ 10; R. 351 at 5 ¶ 10; R. 352 at 5 ¶ 10; Tr. 15, 16, 5323.[6] Potential prejudice would have been further alleviated by an appropriate cautionary instruction regarding the anonymity of the jury. *See*, *e.g.*, *Crockett*, 979 F.2d at 1216-17. However, despite Judge Lindberg's expressed willingness to give such an instruction, neither Young nor any of the other defendants reminded him to do so. Consequently, the defendants cannot properly complain about that omission now. *See Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1567-68 (7th Cir. 1990) (en banc) (per curiam); *Palmquist v. Selvik*, 111 F.3d 1332, 1343 (7th Cir. 1997). In view of the careful voir dire, together with what we believe to be the overwhelming evidence of defendants' guilt, we can discern no concrete way in which the anonymous jury deprived the defendants of a fair trial.

## C. Admission of Officer Cronin's Testimony

Over the objections of the defense, the district court permitted Chicago Police Officer Michael Cronin, a gang spe-

---

[6] Paragraph 10(j) of the questionnaire to which each of the prospective jurors was asked to respond under oath contained the following admonition:

> Under the American system of justice every defendant is *presumed innocent* throughout the trial. Moreover, defendants are not required to prove anything and are entitled to put the government to its proof. Every defendant has an absolute right *not to testify* and the exercise of this right cannot be held against a defendant.

R. 350 at 5 ¶ 10; R. 351 at 5 ¶ 10; R. 352 at 5 ¶ 10 (emphasis in original).

cialist, to give opinion testimony regarding the history, leadership, and operations of the Traveling Vice Lords. Cronin testified that the TVLs controlled narcotics distribution on the west side of Chicago by means of a series of distribution loci known as "drug spots." Tr. 1574.[7] Cronin went on to identify a number of locations that were, in his opinion, controlled by the TVLs, to describe how a "drug spot" operates, and to recount disputes between various factions of the Vice Lords over drug turf. Tr. 1575-82. Cronin was also involved in the investigation that culminated in this prosecution; and he testified as a fact witness regarding surveillance in which he had participated, arrests he had made, various items of evidence that had been recovered, and to a statement that Cox made following his arrest. Tr. 1585-1628.

Although the defendants do not dispute Cronin's qualifications as a gang expert, they maintain that his testimony as to the TVLs' involvement in narcotics distribution amounted to inadmissible hearsay that was prejudicial in the sense that it related to a central issue in the case. Whereas the defendants posited that their narcotics activities reflected multiple, unrelated conspiracies, it was the government's theory that the defendants were involved in a unitary conspiracy that used the TVL organization to distribute cocaine and heroin. That theory was reflected in the superseding indictment, *e.g.*, R. 133 at 2-3, as well as the prosecution's opening and closing statements, Tr. 19-20, 4982. In the defense view, Cronin's testimony as to the operation of the TVL drug distribution network went beyond the bounds of appropriate expert testimony, because rather than helping the jury "to understand the evidence or

---

[7]  "A drug spot will be a certain area, usually a street corner, in the middle of the block, where [gang members involved in narcotics trafficking] control the street operation, where—where individual packets [of drugs] are sold." Tr. 1574.

to determine a fact in issue," Fed. R. Evid. 702, "it simply told them that if the defendants were associated with the TVL, they were part of a unitary conspiracy." Defendants' Joint Opening Br. at 36.

The defendants argue alternatively that even if Cronin's testimony qualified for admission under Rule 702, its potential for prejudicing the defense exceeded its probative value and therefore it should have been excluded pursuant to Federal Rule of Evidence 403. Non-expert, eyewitness testimony regarding the nature and operation of the TVL distribution network was perfectly comprehensible, the defendants insist, and so there was no need for expert testimony to help the jury understand this evidence. At the same time, they argue, the prejudicial effect of Cronin's testimony was "immense." Defendants' Joint Opening Br. at 39. Given his dual role as both a fact and an opinion witness, the defense postulates that the jury may have failed to appreciate when Cronin was testifying to facts based on his personal knowledge and when he was merely offering his opinion, and consequently may have given his opinions undue weight. This danger was particularly acute, the defendants reason, in view of the fact that the only eyewitness testimony concerning TVL operations came from former drug dealers who had an obvious incentive to cooperate with the government. Thus, the jury may have improperly looked to Cronin's opinions as "facts" which corroborated the testimony of these less-than-upstanding witnesses. Although the district court gave a standard instruction admonishing the jury that it was not obliged to accept the opinion testimony of experts, Tr. 5328-29, the defendants point out that the instruction did not specifically advise the jury that Cronin's testimony regarding the operation of the TVL narcotics distribution apparatus constituted opinion, rather than fact, testimony.

We find no abuse of discretion in the district court's decision to permit Cronin to testify as an expert. The average

juror is unlikely to be familiar with the operations of narcotics traffickers or of street gangs. *See*, *e.g.*, *United States v. Anderson*, 61 F.3d 1290, 1297 (7th Cir.) (drug trafficking), *cert. denied*, 516 U.S. 1000, 116 S. Ct. 543 (1995); *United States v. Johnson*, 28 F.3d 1487, 1496-98 & nn. 9, 10 (8th Cir. 1994) (drug trafficking and gangs), *cert. denied*, 513 U.S. 1098, 115 S. Ct. 768 (1995), and *cert. denied*, 513 U.S. 1195, 115 S. Ct. 1263 (1995). Cronin's testimony supplied the jury with useful background concerning the history and structure of the TVLs, as well as with their involvement in narcotics activities.

At the same time, Cronin's testimony did not invite the jury to conclude that membership in the TVLs equated with participation in the charged conspiracy, as the defendants suggest. We can finding nothing in Cronin's testimony which suggested that all TVL members were involved in criminal activity generally or narcotics trafficking in particular. On the contrary, Cronin agreed on cross-examination that "membership in the Vice Lord Nation is not a crime," Tr. 1561, and that membership in a street gang "does not necessarily indicate that you are involved in illegal activities," Tr. 1643. *See also* Tr. 1733. In the same vein, the district court instructed the jury that "[I]t is not illegal to be a member of or associated with the Traveling Vice Lords." Tr. 5325.

Nor do we think it likely that Cronin's dual role as expert and fact witness would have led the jury to be confused as to which aspects of his testimony were opinions and which were factual in nature. Although we have acknowledged that there is a greater danger of undue prejudice to the defendants when a witness testifies as both an expert and a fact witness, *United States v. Doe*, 149 F.3d 634, 637 (7th Cir.), *cert. denied*, 525 U.S. 914, 119 S. Ct. 260 (1998), we have also indicated that a police officer may permissibly testify in both capacities, *United States v. Lightfoot*, 224 F.3d 586, 588-89 (7th Cir. 2000), *cert. denied*, 532 U.S. 976,

121 S. Ct. 1611 (2001). The potential for prejudice in this circumstance can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert. *See United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir. 1994); *United States v. Foster*, 939 F.2d 445, 453 (7th Cir. 1991). In this case, the government structured its direct examination of Cronin in such a way as to separate his opinions as an expert from his factual observations as an occurrence witness, *compare* Tr. 1569-84 *with* Tr. 1586-1628; and both the objections that the defense posed at the transition from opinion to fact as well as the remarks that the district judge made in response to those objections served to highlight the distinction, *see* Tr. 1586-88. Cronin was also extensively voir dired by the defense as to the basis for his opinions, *see* Tr. 1529-32, 1542-64, which again made clear to the jury the distinction between the two aspects of his testimony. Finally, the court reminded the jurors that "the fact an expert has given an opinion does not mean that it is binding upon you or that your are obligated to accept the expert's opinion as to the facts." Tr. 5329. Under these circumstances, we see no real possibility that the jury may have been led to mistakenly credit Cronin's opinions as facts.

D.  Jury Instruction—Conviction or Acquittal

After outlining the two principal elements of the conspiracy charge for the jury, the district court gave the following pattern instruction:

> If you find from your consideration of all the evidence that both of these propositions [have] been proved beyond a reasonable doubt with regard to the defendant you are then considering, then you should find that defendant guilty.

If, on the other hand, you find from your consideration of all of the evidence that either of these propositions has not been proved beyond a reasonable doubt as to the defendant you are then considering, then you should find that defendant not guilty.

Tr. 5331. The court repeated this same instruction with respect to each count of the indictment. Tr. 5334, 5336-37, 5338-39.

The defendants argue that the language of this instruction was flawed to the extent that it advised the jury that it "should" rather than "must" acquit a defendant if it found that the government had not proved the elements of the crime charged beyond a reasonable doubt. "Should," in the defendants' view, is a permissive term, suggesting that the jury had discretion whether or not to find a defendant not guilty even if the government had not met its burden of proof. Of course, if it is reasonably likely that the jury understood the instructions to permit conviction on something less than proof beyond a reasonable doubt, it constituted reversible error. *See Victor v. Nebraska*, 511 U.S. 1, 6, 114 S. Ct. 1239, 1243 (1994). However, the defendants did not object to the instruction in the district court, so we may reverse only if the flaw in the instruction, if any, amounts to plain error. *E.g.*, *United States v. Inglese*, 282 F.3d 528, 536-37 (7ᵗʰ Cir. 2002).

Our opinion in *United States v . Kerley*, 838 F.2d 932 (7ᵗʰ Cir. 1988), makes clear that the language at issue was not plainly erroneous. In that case as in this one, the defendant argued that the use of the term "should" gave the jury license to convict the defendant even if the government had not established his guilt beyond a reasonable doubt. We flatly rejected that argument:

Least of the alleged trial errors is the judge's having instructed the jury that they "should" rather than "must" acquit Kerley in the event the government had

failed to prove his guilt beyond a reasonable doubt. "Must" is preferable; but it is hardly plausible that the jury supposed that while they "should" acquit Kerley if he was not guilty beyond a reasonable doubt, they didn't have to acquit him if they didn't want to. Juries know better than that. We add that the judge also said that the jury "should," not "must," convict Kerley if they found that he was guilty beyond a reasonable doubt. In context, "should" was imperative—not hortatory— throughout the instruction.

*Id.* at 940. Although the defendants suggest that the Supreme Court's opinions in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078 (1993), and *Victor* have undermined our decision in *Kerley*, we disagree. The instruction at issue here did not mis-describe the burden of proof, as was the case in *Sullivan*, *see* 508 U.S. at 277-78, 113 S. Ct. at 2080-81. The jury was properly informed that the government was obliged to prove the defendants guilty beyond a reasonable doubt. Tr. 5323. Moreover, the Court in *Victor* described the constitutional question raised by flawed language regarding the burden of proof as "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* [reasonable doubt] standard. 527 U.S. at 6, 114 S. Ct. at 1243; *see In re Winship*, 397 U.S. 358, 90 S. Ct. 1068 (1970). That is the very question we answered in *Kerley* vis à vis use of the term "should"—and we found it implausible that the jury believed acquittal was optional if the government failed to meet its burden of proof. 838 F.2d at 940; *see also United States v. Ray*, 238 F.3d 828, 834-35 (7th Cir.), *cert. denied*, 532 U.S. 1045, 121 S. Ct. 2014 (2001). Accordingly, we find no plain error in the language of this instruction.

E.  Multiple Conspiracies Instruction

As we have noted, it was the defense theory in this case that the defendants had not joined a unitary conspiracy but at most had participated in a number of smaller, unrelated conspiracies. The district court delivered the following instruction on the subject of multiple conspiracies:

> The indictment charges that the defendants participated in a single conspiracy to distribute illegal narcotics.
>
> Proof that there were multiple conspiracies is not necessarily proof of a single conspiracy, nor is it necessarily inconsistent with the existence of a single conspiracy.
>
> If you do not find beyond a reasonable doubt that a particular defendant was a member of any conspiracy, you should find that defendant not guilty of Count 1 [the conspiracy charge].
>
> If you find beyond a reasonable doubt that there was one overall conspiracy as alleged in Count 1, and that a particular defendant was a member of that conspiracy, then you should find that defendant guilty of Count 1.
>
> If you find beyond a reasonable doubt that there were two or more conspiracies, and that a particular defendant was a member of or aided and abetted one or more conspiracies, you may find that defendant guilty of Count 1, if you further find beyond a reasonable doubt that this proven conspiracy was included within the conspiracy alleged in Count 1.
>
> If, on the other hand, the proven conspiracy is not included within the conspiracy alleged in Count 1, you should find the defendant not guilty of Count 1.

Tr. 5332-33. The defendants argue that this instruction deprived them of their Fifth Amendment right to due

process, and to their Sixth Amendment right to trial by jury, because although it required each juror to find that a defendant had participated either in the conspiracy alleged in the indictment or a lesser conspiracy included within the charged conspiracy, it did not state that the members of the jury must agree on which conspiracy the defendant had joined.

As the defendants acknowledge, however, we approved a virtually identical instruction in *United States v. Wilson*, 134 F.3d 855, 865 (7th Cir.), *cert. denied*, 525 U.S. 894, 119 S. Ct. 216 (1998). We noted:

> [The instruction] informed the jury that, if it found that a defendant was a member of a conspiracy that constituted a sub-part of the conspiracy charged in the indictment, then it should find that defendant guilty. The jury's finding of guilt therefore concluded that the [defendants] were members of a conspiracy and that, at a minimum, this conspiracy was part of the single conspiracy alleged by the Government.

*Id.* at 865. That the jurors were not informed they must agree on exactly which conspiracy the defendant agreed to join does not present a constitutional problem. Even if the jurors were of different minds as to the precise parameters of the conspiracy, the instruction required them all to agree that the defendant joined a conspiracy that was within the ambit of the conspiracy alleged in the indictment. In short, with respect to the *essential* elements of the crime (the existence of a conspiracy, and the defendant's agreement to join it), the instruction appropriately required unanimity. *See Richardson v. United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 1710 (1999).

Moreover, even if the instruction were defective as the defendants suggest, the error was harmless. The evidence overwhelmingly demonstrated that the defendants participated in a unitary conspiracy to traffic in narcotics, pursu-

ant to which Bahman and Mohammad Mansoori supplied the drugs to Young, who in turn, with the assistance of Cox and Choice, distributed them through a network of drug spots.

F.  Failure to Submit Drug Quantity to Jury

The district court sentenced defendants Young, Mohammad Mansoori, Cox, and Choice to terms of life imprisonment based on its finding that they conspired to distribute more than 150 kilograms of cocaine. *See*, *e.g.*, R. 745-3, Young Sentencing Tr. 35-37; R. 730, Cox Sentencing Tr. 21, 23-24; R. 748, Choice Sentencing Tr. 17-18. The various subsections of 21 U.S.C. § 841(b)(1) set forth a number of different minimum and maximum sentences depending on the amount of drugs involved, and subsection (A) specifies a maximum prison term of life for narcotics offenses involving five or more kilograms of cocaine or one or more kilograms of heroin. However, pursuant to the Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), the indictment must allege, and a jury must unanimously find, that the offense involves that threshold amount before the court may sentence a defendant to the life term authorized by section 841(b)(1)(A). *See*, *e.g.*, *United States v. Smith*, 241 F.3d 546, 547 (7th Cir.), *cert. denied*, 122 S. Ct. 267 (2001). In the absence of a jury finding, the default statutory maximum for cases in which no particular quantity of narcotics is proven—the twenty-year maximum provided for in section 841(b)(1)(C)—applies.[8] In this case, the jury was not asked to decide whether the conspiracy involved any particular drug amount; on the contrary, the court instructed the jury that "[t]he Government does not have to prove the amount of

---

[8]  The district court sentenced Bahman Mansoori to a term of 170 months, which is of course below the default maximum of twenty years. Accordingly, his sentence is unaffected by *Apprendi*.

controlled substances alleged in the indictment," Tr. 5335, but rather it need only determine that the offenses charged in Count 1 (the conspiracy charge) and Count 2 (a substantive charge of distribution against defendants Young and Choice) involved "a measurable amount" of narcotics, *id.* Accordingly, the district court, which sentenced the defendants before the Supreme Court decided *Apprendi*, erred in imposing any sentence in excess of the default maximum of twenty years. As this issue was not raised below, however, the mistake must qualify as "plain" before the defendants are entitled to relief. *United States v. Nance*, 236 F.3d 820, 823-24 (7th Cir. 2000), *cert. denied*, 122 S. Ct. 79 (2001).

Because we do not believe that the sentencing error affected the fairness, integrity, or public reputation of the proceedings below, *see United States v. Johnson*, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549 (1997), we conclude that the error does not constitute "plain" error. Having reviewed the record, we are convinced that upon a properly worded indictment, a properly instructed jury would have found the defendants guilty of distributing the requisite threshold quantities of narcotics. *See Nance*, 236 F.3d at 825-26. The jury convicted the defendants on the conspiracy charge, and the record leaves no doubt that the conspiracy involved the distribution of far more than five kilograms of cocaine and/or one kilogram of heroin. Indeed, the trial evidence readily confirms the trial court's finding that the defendants who received life terms were responsible for the distribution of at least 150 kilograms of cocaine. For example, co-conspirator Billy Carter testified that in 1994 he and Young had retrieved a twenty- to thirty-kilogram quantity of cocaine from Mohammad Mansoori—whom Carter knew as "Moe"—, which cocaine was then passed along in five- or ten-kilogram quantities to other TVL members, including defendants Cox and Choice. Tr. 690-97. Carter said that he retrieved comparable quantities of cocaine from Mansoori more than five times in 1994 and 1995. Tr.

1052-53. Carter further testified that he alone was distributing three to five kilograms of cocaine per week in 1992, and five to ten kilograms weekly in 1993 and 1994—which yields a total of several hundred kilograms. Tr. 1119-22.[9] In a similar vein, Leslie Teague testified that he and co-conspirator Andre Donaldson obtained about five kilograms of cocaine per week from Young during the first few months of 1994 for distribution in the Quad Cities area of Illinois. Tr. 2090. (Carter testified that he and Choice delivered ten kilograms of cocaine to Teague on one occasion in 1993 or 1994. Tr. 696-99.) The evidence concerning heroin distribution similarly confirms that the conspirators were dealing in large quantities. TVL member Anthony Buchanan, for example, who shared a drug spot with Carter, testified that he obtained quantities of between 100 and 800 grams of heroin from Mohammad Mansoori and his "runner" John Hunt once or twice weekly in 1996. Tr. 1844-50. Carter testified that he was distributing 100 grams of heroin per day in that same year. Tr. 1117-18. Terry Bronson testified that Choice had him deliver 2.4-gram "packs" of heroin (twenty-four bags, each containing 0.1 gram of heroin) to the Henry Horner Homes on a daily basis from February to October 1996 (yielding a total of more than 500 grams). Tr. 342-43. Thus, the evidence before the jury consistently and overwhelmingly demonstrated that the defendants were distributing cocaine and heroin on a very large scale. In view of that evidence, there can be no doubt that the jury would have found that the offense involved the threshold amount of five kilograms of cocaine and/or one kilogram of heroin as necessary to authorize prison terms of life for defendants Young, Mohammad Mansoori, Cox, and Choice. *See Nance*, 236 F.3d at 826.

---

[9]  Carter, however, after pleading guilty and cooperating with the government, was sentenced on a cocaine quantity of only 50 to 150 kilograms. *See* Tr. 1123-24.

G.  Erroneous Life Sentences on Count Two

Count Two of the superseding indictment charged Young and Choice (among others) with the distribution of one kilogram of cocaine in the October 31, 1996 transaction described at the outset of this opinion. R. 133 at 5. Pursuant to 21 U.S.C. § 841(b)(1)(B)(ii), the maximum prison term that could ever be imposed on this count was forty years because the underlying conduct involved more than 500 grams of cocaine but less than five kilograms. The district court, however, erroneously sentenced Young and Choice to life terms on this count. The government concedes the error. Gov. Br. 56 & n.28. Accordingly, we shall remand the case to the district court for re-sentencing on this count.

Because the jury was not asked to determine whether the defendants were responsible for distributing anything more than a "measurable amount" of cocaine, Tr. 5335, in accord with *Apprendi* the district court on remand may not impose a sentence in excess of twenty years on Count 2. *See* 21 U.S.C. § 841(b)(1)C). It may well be true, as the Government contends, that the jury inevitably would have found Young and Choice responsible for distributing a kilogram of cocaine, thus triggering the forty-year maximum, had it only been asked to do so. That point would only be relevant, however, if we were deciding whether a forty-year term, imposed without the quantity finding that *Apprendi* requires, amounted to harmless error. In this case, because the district court imposed a life term on Count 2 (a term that would be erroneous regardless of whether the jury had found the defendants named in this count responsible for a kilogram quantity of cocaine), re-sentencing is mandated. When it imposes the new sentence, the district court will of course be obliged to honor *Apprendi*. Because the jury did not render a quantity finding, as *Apprendi* requires, the maximum term that the district court may impose on remand is the default maximum term of twenty years specified in section 841(b)(1)(C).

## H.  Erroneous Special Assessments

The district court imposed special assessments of $100 as to Mohammad Mansoori on Counts 3 through 13 and Young on Count 14. Because these monetary offenses were committed prior to April 24, 1996 (*see* R. 133 at 6, 8), when the applicable special assessment was raised from $50 to $100, only a $50 special assessment could be imposed. *E.g.*, *United States v. Gricco*, 277 F.3d 339, 363-64 (3rd Cir. 2002); *United States v. Prather*, 205 F.3d 1265, 1272 (11th Cir.), *cert. denied*, 531 U.S. 879, 121 S. Ct. 188 (2000). Accordingly, we shall also remand for re-sentencing in this regard as well.

## I.  Admissibility of Cox's Post-Arrest Statement

After a federal grand jury indicted Cox and his co-defendants, a federal warrant was issued for his arrest. At 10 p.m. on a Saturday evening, Chicago police officers arrested Cox on that warrant. Chicago police officer and gang specialist Michael Cronin (who had participated in the investigation that culminated in Cox's arrest) interviewed Cox later that evening and obtained a waiver of Cox's *Miranda* rights. Tr. 1607-13. Cox eventually admitted to Cronin that he was a high-ranking TVL member who was involved in the distribution of cocaine on Chicago's west side. Tr. 1609-12. The Chicago Police Department has special rules and procedures that apply when an individual is arrested pursuant to a warrant issued by another jurisdiction. *See* Tr. 1612-13. Apparently because Cox's arrest took place on the weekend, it took some time to comply with these rules, and Cox was not turned over to federal authorities until the following Monday morning, at 7:00 a.m. Cox arrived at the Dirksen Federal Building in Chicago at approximately 7:30 a.m. Apparently, when the government inquired into the possibility of bringing Cox before a judicial officer, Judge Lindberg's chambers in-

structed the government to bring him before Judge Lindberg that afternoon at 1:30. At approximately 8:30 a.m., Officer Robert Grapenthein (another Chicago police offer and gang specialist who had been detailed to the FBI gang task force and who had participated in the investigation of this case) played for Cox some of the incriminating tapes produced by the government's surveillance and then proceeded to interview him. Cox again waived his *Miranda* rights and again confessed his involvement with the TVL and with narcotics distribution. Tr. 1446-53, 1456-58. Not until 1:30 p.m. that afternoon, some 39 hours after his arrest, did Cox appear before a judicial officer (Judge Lindberg) for arraignment. R. 259.

Because Cox made his second confession more than thirty hours after his arrest and before the government brought him before a judicial officer, Cox moved to suppress the confession. In relevant part, Federal Rule of Criminal Procedure 9(c)(1), which deals with the execution of federal warrants, requires that an individual arrested on a warrant be taken before a judicial officer promptly:

> The officer executing the warrant shall bring the arrested person without unnecessary delay before the nearest available federal magistrate judge or, in the event that a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

(Rule 5(a) sets forth a similar requirement for an arrest pursuant to a warrant issued upon a complaint.) In *McNabb v. United States*, 318 U.S. 332, 344-47, 63 S. Ct. 608, 614-16 (1943), and again in *Mallory v. United States*, 354 U.S. 449, 455-56, 77 S. Ct. 1356, 1360 (1957), the Supreme Court held that unreasonable pre-interview delays in arraigning the defendants (two days in *McNabb*, seven hours in *Mallory*) rendered the confessions made on the heels of and as a result of those delays inadmissible at trial.

In the wake of *Mallory*, Congress established a six-hour "safe harbor" for post-arrest statements:

> In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law enforcement officer or law enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention . . . .

18 U.S.C. § 3501(c). A voluntary confession that occurs within this six-hour "safe harbor" is therefore admissible notwithstanding a delay in bringing the defendant before a judicial officer. This provision embraces Cox's first confession (to Cronin) but not his second (to Grapenthein), which occurred more than thirty hours after his arrest but before he was arraigned. A voluntary confession that occurs after the six-hour safe-harbor period may be inadmissible pursuant to *McNabb*, *Mallory*, and their progeny. Exclusion is not automatic but discretionary, turning on "a congeries of factors, including such elements as the deterrent purpose of the exclusionary rule, the importance of judicial integrity, and the likelihood that admission of evidence would encourage violations of the Fourth Amendment." *United States v. Gaines*, 555 F.2d 618, 623-24 (7th Cir. 1977); *see also United States v. Spruill*, 296 F.3d 580, 590 (7th Cir. 2002).

The district court denied Cox's motion to suppress for two reasons. First, the court reasoned that because Cox had been in *federal* custody for less than six hours at the time

he gave his statement to Grapenthein, his confession fell within the safe harbor notwithstanding the period of time he spent in the custody of the Chicago police before he was handed over to federal officials. R. 332. Second, the court found that Cox had not been detained in state custody as long he was in order to help federal officials to obtain a confession from him. *Id.*; *cf. Gaines*, 555 F.2d at 625 (if defendant had shown that federal agents colluded with local police to keep in custody in order to obtain a confession from him, suppression would be required).

The first of these reasons was erroneous as a matter of law. As the government rightly points out, the six-hour clock begins to run for purposes of section 3501(c) when the individual is arrested or otherwise detained for a violation of federal law, not when he is taken into federal custody. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358, 114 S. Ct. 1599, 1604 (1994); *compare United States v. Rowe*, 92 F.3d 928, 932-33 (9th Cir. 1996) (defendant initially taken into custody on state charge), *cert. denied*, 519 U.S. 1100, 117 S. Ct. 785 (1997). Although it was the Chicago police who arrested Cox, they did so pursuant to a federal arrest warrant. Consequently, the statutory clock began to run on Saturday evening, when Cox was arrested, not on Monday morning, when he was transferred to federal custody. As the clock had been running for approximately thirty-six hours by the time Cox confessed his culpability to Grapenthein, his confession is not protected by the statutory safe harbor.

We must, consequently, consider the reasons for the additional delay (that is, beyond the six-hour safe-harbor period) in bringing Cox before a judicial officer and whether that delay was reasonable, along with the other factors cited by *Gaines*. The government notes that the bulk of the delay was due to the fact that Cox was arrested on a Saturday evening by the Chicago police, whose rules regarding arrests on warrants issued by other jurisdictions

required additional processing time before he was released into federal custody. Once Cox was turned over to federal officials, the government notes, it inquired about bringing him before a judicial officer and was instructed by Judge Lindberg to present him for arraignment at 1:30 p.m. Further, there are no allegations that Cox was in any way subject to the kind of "third degree" interrogation tactics that concerned the Supreme Court in *McNabb*. Finally, in view of the district court's finding that the delay in arraigning Cox was not due to a desire to secure his confession, the government argues that exclusion of his statement to Grapenthein would not serve the deterrent purposes of the exclusionary rule.

Although we accept the district court's finding that there was no coordinated effort between state and federal officials designed to keep him in state custody for a prolonged period in order to facilitate his confession,[10] we are nonetheless troubled by the decision to interview him for a second time well outside of the safe-harbor period and before he was finally arraigned. By the time Grapenthein interviewed Cox on Monday morning, the government was aware that Cox had been in custody for more than thirty hours, that he had not yet seen a judicial officer, and that he would not be arraigned until that afternoon. Nonetheless, the government evidently made a deliberate decision to interview Cox

---

[10] As Cox points out, the district court did not hold an evidentiary hearing in order to explore the circumstances surrounding his arrest and detention, the interrogations by Cronin and Grapenthein, and, in particular, the reasons for the delay in bringing Cox before a judicial officer. Still, Cox has not challenged the reasons that the government has articulated for the delay in his arraignment, nor has he alleged that there are facts other than the delay (*e.g.*, coercive interview tactics) which bear on the admissibility of his confession. Consequently, we have no reason to question the district court's finding that the delay was not motivated by a desire to extract a confession from Cox.

at that time, rather than wait until he had been arraigned. Perhaps the government, but for the district court's decision to have Cox arraigned that afternoon, would have brought him before a duty magistrate that morning (certainly there was one available) and interviewed him following the arraignment. But once instructed by the district court to present Cox that afternoon, and in the absence of any apparent exigency necessitating an immediate interview, the advisable course would have been to put the interview on hold until Cox had been arraigned. The prompt-appearance requirement serves to protect the defendant's rights and to interpose a check on law enforcement zeal by ensuring the timely intervention of a judicial officer who can confirm that the defendant has been advised of his rights, that he has been detained on probable cause, and so on. *See McNabb*, 318 U.S. at 343-44, 63 S. Ct. at 614-15. That purpose was not served by the decision to interview Cox at a point when there had already been a substantial delay in bringing him before a judicial officer and his belatedly scheduled appearance was but a few hours hence. We impute no actual motives to the government that were malevolent; but objectively the decision to proceed with the interview on Monday morning was unreasonable, and in the absence of a more developed record as to the circumstances surrounding that decision, it gives rise to an impression that the government was attempting to take advantage of the delay in arraigning Cox. Under these circumstances, the decision to elicit a second statement from Cox appears improper. At the same time, exclusion of this statement would serve efficaciously the deterrent purposes of the exclusionary rule by encouraging the government to bring an arrested individual before a magistrate or judge more promptly. *See generally Arizona v. Evans*, 514 U.S. 1, 10-11, 115 S. Ct. 1185, 1191 (1995); *United States v. Leon*, 468 U.S. 897, 918-20 & n.20, 104 S. Ct. 3405, 3418-19 & n.20 (1984); *see also*, *e.g.*, *McNabb*, 318 U.S. at 344-45, 63 S. Ct. at 615; *United States v. Wilbon*, 911 F. Supp. 1420 (D. N.M.

1995). Based on the record before us, we therefore find that the admission of Cox's second confession (to Grapenthein) was erroneous; that confession should have been suppressed.

Under the circumstances, however, we find the error to be harmless. As we have noted, Cox confessed his involvement in narcotics distribution not only to Grapenthein, but to Cronin, who interviewed him on Saturday evening shortly after his arrest, within the six-hour safe harbor. Cox's first confession was recounted by Cronin at trial, and Cox does not contest the admissibility of that confession. The first confession overlapped in material respects with the second. *Compare* Tr. 1443-58 *with* Tr. 1607-13, 1637-41. Indeed, in objecting to Cronin's testimony regarding the first confession (as it turned out, Cronin testified after Grapenthein did), Cox's counsel argued that Cronin's testimony was unnecessary to the government's case in view of the overlap. Tr. 1516-17. Accordingly, the second confession, although inadmissible for the reasons we have discussed, did not unduly prejudice Cox. *See Boles v. Foltz*, 816 F.2d 1132, 1135-36 (6th Cir.) (even if it was error to admit second confession elicited improperly after defendant had requested attorney, error was harmless because, inter alia, second confession was cumulative of first), *cert. denied*, 484 U.S. 857, 108 S. Ct. 167 (1987).

J.    Cox's Post-Arrest Statement and Young's Confrontation Rights

Among other things, Cox's post-arrest confession to Grapenthein indicated that he was assigned responsibility for cocaine sales in a particular area of Chicago by "members within the Traveling Vice Lords that were above him." Tr. 1451. Grapenthein, of course, repeated this statement at trial. *Id.* Before Grapenthein testified, the court instructed the jury to consider his testimony about Cox's

statement "only in connection with the Government's case against Defendant Mark Cox." Tr. 1443. Again in the final jury charge, the court admonished the jury to consider Cox's confession "only with regard to the Defendant Mark Cox and not against any other defendant." Tr. 5326. Young nonetheless argues that the admission of Cox's confession ran afoul of *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968). Young reasons that Cox's reference to the TVL members "above him" necessarily inculpated Young, because Young was the only indicted TVL member who was superior to Cox in the gang's hierarchy. Young asked the district court to declare a mistrial on the basis of *Bruton*, but the court denied the motion.[11]

The admission of Cox's post-arrest statement did not run afoul of *Bruton*. *Bruton* held that the admission into evidence of a co-defendant's confession violates the defendant's rights under the Confrontation Clause of the Sixth Amendment when the confession incriminates the defendant as well. 391 U.S. at 135-36, 88 S. Ct. at 1627-28. However, as the Court's subsequent opinion in *Richardson v. Marsh* makes clear, the co-defendant's confession must implicate the defendant directly to give rise to a *Bruton* violation. 481 U.S. 200, 208, 107 S. Ct. 1702, 1707-08 (1987). If the confession incriminates the defendant only "when linked with evidence introduced later at trial," *id.* at 208, 107 S. Ct. at 1707, then a limiting instruction confining the jury's consideration of the statement to the confessing co-defen-

---

[11] It is not entirely clear from the trial transcript that Young articulated the particular *Bruton* theory that he pursues now at the time he moved for a mistrial in the district court. *See* Tr. 1455. But the government has elected to address the merits of his current *Bruton* theory rather than contend that he forfeited that theory by failing to argue it below. The government has therefore waived any contention based on forfeiture or waiver. *See, e.g., United States v. Buchmeier*, 255 F.3d 415, 419 (7th Cir.), *cert. denied*, 122 S. Ct. 505 (2001).

dant likely will suffice to protect the defendant's rights. *Id.* at 208, 211, 107 S. Ct. at 1708, 1709; *see also*, *e.g.*, *United States v. Chrismon*, 965 F.2d 1465, 1471-73 (7th Cir. 1992). That is the case here. Cox's statement implicated Young indirectly at best. Cox's reference to persons "above him" in the TVL hierarchy did not point unambiguously to Young. Only in light of other evidence revealing Cox to have been superior to Young in the TVL hierarchy might the jury have inferred that Young was among the individuals that assigned Cox his territory. Even then, the inference was not inevitable—by referring to multiple TVL "members" who gave him his authority, Cox did not purport to single out any particular individual. Under the circumstances, the district court's instructions limiting consideration of Cox's confession to Cox alone was sufficient to protect Young.

## K.  Denial of Bahman Mansoori's Motion to Sever

Bahman Mansoori asked the district court to sever his trial from that of the other defendants. His argument then, as now, was that the evidence against the other defendants was much stronger than it was against him, and that he faced a particular danger of the jury inferring guilt by association in view of the fact that his brother Mohammad played a key role in the conspiracy as the individual who supplied narcotics to Young and there was also evidence that another Mansoori brother was also involved in drug trafficking. The district court denied the motion to sever, reasoning that the jury was capable of assessing the guilt or innocence of each defendant independently at a joint trial and that severance would require the government to duplicate much of its case at multiple trials. R. 742-1, 12/18/97 Tr. at 67-68; R. 301. We review the district court's decision for abuse of discretion. *E.g.*, *United States v. Wilson*, 237 F.3d 827, 835 (7th Cir.), *cert. denied*, 122 S. Ct. 97 (2001). In order to secure a new trial, the defendant must demonstrate that the joint trial caused him "actual

prejudice," i.e., that he was deprived of a fair trial by virtue of the district court's refusal to sever. *Id.*

The district court did not abuse its discretion in denying Bahman's motion. As the government points out, Bahman did not join the conspiracy until November 1996, and it is his late joining that accounts for the fact that there was less evidence regarding his participation than there was against the other co-defendants. But the evidence leaves no doubt that he was a full participant in the conspiracy once he joined. A number of the tape recorded conversations among members of the conspiracy reveal Bahman discussing various narcotics transactions, for example. John Hunt also testified that he had picked up narcotics from Bahman at Bahman's apartment, and had dropped off payments there as well. The cases affirming joint trials under such circumstances, notwithstanding the different degrees of involvement among various co-conspirators and the different magnitudes of evidence against each defendant, are legion. *E.g.*, *United States v. Smith*, 995 F.2d 662, 671 (7th Cir. 1993), *cert. denied*, 510 U.S. 1056, 114 S. Ct. 718 (1994); *United States v. Goines*, 988 F.2d 750, 781 (7th Cir.), *cert. denied*, 510 U.S. 887, 114 S. Ct. 241 (1993), and *cert. denied*, 510 U.S. 982, 114 S. Ct. 483 (1993), and *cert. denied*, 510 U.S. 985, 114 S. Ct. 558 (1993); *United States v. Cochran*, 955 F.2d 1116, 1120-21 (7th Cir.), *cert. denied*, 506 U.S. 972, 113 S. Ct. 460 (1992); *United States v. Pace*, 898 F.2d 1218, 1245-46 (7th Cir.), *cert. denied*, 497 U.S. 1030, 110 S. Ct. 3286 (1990), and *cert. denied*, 498 U.S. 878, 111 S. Ct. 210 (1990); *United States v. Briscoe*, 896 F.2d 1476, 1516-17 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S. Ct. 173 (1990). Bahman has not demonstrated that there was such a great disparity in the evidence that he could not have received a fair trial without a severance. *See United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988), *cert. denied*, 492 U.S. 908, 109 S. Ct. 3221 (1989). The district court properly instructed the jury to consider each

defendant's culpability separately, Tr. 977-78, 5326-27, and we presume that the jury followed that instruction, *see, e.g., United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002).

L.   Admission of Tape Recordings and English Translations of Telephone Conversations in Farsi

Among the intercepted and recorded conversations that the district court admitted into evidence at trial were a series of conversations in Farsi. FBI language specialist Behrooz Sarshar listened to these recordings over a period of two months and prepared English translations of the conversations that were also introduced into evidence at trial. The transcripts identified Mohammad and Bahman Mansoori as participants in these conversations. Sarshar testified that having listened to the tapes over a two-month period, and having heard the two Mansoori brothers speak at a court proceeding that took place in advance of trial, he was able identify the voices on the tapes as belonging to Mohammad and Bahman Mansoori. Tr. 2491-2501; *see also* Tr. 2627. The Mansooris contend that the tape recordings and translations were inadmissible because, in their view, Sarshar lacked an adequate basis upon which to identify the voices on the recordings as theirs.

We believe that the tapes and translations were properly admitted. Federal Rule of Evidence 901(b)(5) permits a witness to identify a voice "based upon hearing the voice *at any time* under circumstances connecting it with the alleged speaker." (Emphasis supplied.) Nothing in the rule, therefore, would preclude a witness from identifying the participants in a tape-recorded conversation based on listening to those individuals participate in a court proceeding. Granted, Sarshar only had one opportunity to hear Bahman and Mohammad Mansoori speak in a setting that disclosed their identities. However, we have held that an

individual's "minimal familiarity" will suffice to permit him to identify a speaker's voice. *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995); *United States v. Degaglia*, 913 F.2d 372, 376 (7th Cir. 1990); *United States v. Alvarez*, 860 F.2d 801, 809 (7th Cir. 1988), *cert. denied*, 493 U.S. 829, 110 S. Ct. 97 (1989). Having reviewed the record, we are inclined to agree with the Mansooris that the basis for Sarshar's identification was relatively weak. Yet, we cannot say as a matter of law that the brief opportunity Sarshar had to hear the defendants in court was insufficient to permit his voice identification. The accuracy of his identification, of course, was a question for the jury, *e.g.*, *Degaglia*, 913 F.2d at 376 n.3, and the jury was properly advised on that point, Tr. 5341-42.

Moreover, as the government points out, other evidence circumstantially supported Sarshar's attributions. *See Alvarez*, 860 F.2d 809. First, co-conspirator John Hunt identified the Mansoori brothers as the speakers in one of the conversations in which he had participated. Tr. 2702-03. Moreover, Officer Grapenthein had heard Mohammad Mansoori conduct a number of conversations in English on the same phone from which the Farsi conversations were intercepted, Tr. 2347, and for that reason one might reasonably infer (as he did) that Mohammad Mansoori was one of the participants in the Farsi conversations. Indeed, the subscriber for the telephone from which the Farsi conversations were intercepted was listed as "Anthony Mirabelli," a name that the evidence revealed to be an alias used by Mohammad Mansoori; and a bill for that telephone was found in a search of Mohammad's home. Tr. 2294-95, 3365-68. Finally, a number of the intercepted conversations in Farsi were placed from a cellular telephone that was discovered in Bahman Mansoori's apartment and for which service had been arranged by Bahman's girlfriend. Tr. 2357-58, 3203-06, 3536-3538, 3632-35.

M.  Evidence of Prior, Narcotics-Related Forfeiture of Mohammad Mansoori's Assets

In 1990, an undercover Illinois state police officer arranged to sell 60 kilograms of cocaine to Jamshid Mansoori (brother to Mohammad and Bahman) for $1.3 million. When the officer arrived at a pre-arranged location to consummate the deal, Jamshid indicated that he had only $350,000 with him, but that his brother would be arriving shortly with the balance of the purchase money. Mohammad joined the other two thereafter and displayed a gym bag to the officer containing many bundles of currency. Jamshid and Mohammad Mansoori were arrested and charged with narcotics trafficking, and eventually they pleaded guilty. Pursuant to the plea agreement, they forfeited the two automobiles that they had driven to the meeting with the undercover officer, some $263,000 in cash, and "several hundred items of jewelry." Tr. 2979.

The district court admitted testimony concerning the 1990 offense and Mohammad's forfeiture of assets pursuant to his guilty plea under Federal Rule of Evidence 404(b). The court instructed the jury that this testimony was admitted insofar as it bore upon Mohammad's intent to conspire to distribute narcotics and on his ability, intent, and knowledge to launder drug proceeds, and that the evidence was to be considered in these respects alone. Tr. 2969. The undercover officer who participated in the transaction then briefly described the details of the crime and Mohammad's forfeiture of assets. Tr. 2969-79. An expert in the field of jewelry appraisal later testified as to the value of the approximately fifty pieces of jewelry that had been seized from Mohammad's home (which was among the jewelry that was forfeited). Tr. 3482-3494. Although Mohammad does not challenge the testimony regarding the nature of the 1990 transaction, he contends that the district court erred when it allowed evidence regarding his forfeiture of assets and the value of the jewelry found in his

home at the time of the 1990 offense. We review the district court's decision for abuse of discretion. *E.g.*, *United States v. Best*, 250 F.3d 1084, 1090 (7th Cir.), *cert. denied*, 122 S. Ct. 279 (2001).

We find no abuse of discretion in the admission of this testimony. The district court found that the forfeiture evidence was admissible in part to demonstrate Mohammad's ability to engage in substantial drug transactions involving large amounts of money. R. 339. As the government's case against Mohammad here posited that he was supplying his co-conspirators with large sums of narcotics, we have no quarrel with the district court's assessment. *See*, *e.g.*, *United States v. Denberg*, 212 F.3d 987, 994 (7th Cir. 2000) (evidence of prior drug trafficking admissible to show, inter alia, defendant's ability to traffic in significant quantities of narcotics); *United States v. Shields*, 999 F.2d 1090, 1099 (7th Cir. 1993) (evidence of defendant's prior payments to judge relevant "because it demonstrated he had the ability, willingness, and chutzpah to bribe a judge"), *cert. denied*, 510 U.S. 1071, 114 S. Ct. 877 (1994); *United States v. Chaverra-Cardona*, 879 F.2d 1551, 1555 (7th Cir. 1989) (evidence of defendant's finances was probative of his resources and ability to carry out charged murder-for-hire schemes). The jury was properly instructed as to the limited purposes for which this evidence was offered, and given that the state police officer's testimony about the 1990 forfeiture occupied no more than one page among the several thousand pages of the trial transcript, *see* Tr. 2979, we discern the likelihood of undue prejudice to Mohammad as slight. *Cf. United States v. Macias*, 930 F.2d 567, 572 (7th Cir. 1991) (where Rule 404(b) testimony was "brief and non-inflammatory in nature," risk of prejudice was minimized). As for the value of the jewelry seized in 1990, Mohammad's sole argument is that the value was irrelevant absent proof that he himself had purchased the jewelry. As the district court observed, however, it is at least a fair inference that

Mohammad had purchased the jewelry given that it had been found in his possession. Tr. 3544.

N.  Requested Recusal of District Judge

In advance of trial, Young filed a motion in which the other defendants subsequently joined asking the district judge to recuse himself pursuant to 18 U.S.C. § 455 for two reasons: (1) the judge's daughter was dating an agent of the U.S. Drug Enforcement Administration ("DEA"); and (2) his daughter, as an employee of the Chicago Crime Commission, was writing a book about gangs and drugs. R. 285; *see* Tr. 742-1, 12/18/97 Tr. 8. The judge denied the motion, concluding that neither his daughter's relationship with the DEA agent nor her work for the Crime Commission reasonably called into question his ability to be impartial in this case. *Id.* at 9-10. The judge observed that he had met the DEA agent that his daughter was dating on three or four occasions, that the agent had no involvement with this case, that the DEA generally had nothing more than a tangential involvement with this case, and that the judge had not discussed the case with him. *Id.* at 11; R. 742-2, 1/5/98 Tr. 8, 10. As to his daughter's work, the judge noted that she had been employed with the Crime Commission for several years, that in the course of her employment she had written and edited a report entitled "The New Faces of Organized Crime," that she had not discussed the report with him, that he had read no more than the title page of the report, and that he had no idea whether the report discussed either the TVLs or any other group. R. 742-1, 12/18/97 Tr. 5, 12-13; R. 742-2, 1/5/98 Tr. 8-9. (The record indicates, in fact, that defense counsel obtained a copy of the report and that it did not mention the TVLs. *See* R. 742-2, 1/5/98 Tr. 7.) Neither Young nor any other defendant filed a petition for mandamus following the district court's ruling, an omission that forecloses appellate relief under section 455. *See United States v. Smith*, 210 F.3d 760, 764 (7th Cir.

2000). Mohammad Mansoori nonetheless argues that the judge's refusal to recuse himself deprived him of his Fifth Amendment right to due process. Because he did not rely on the due process clause below, he forfeited this argument and our review is confined to one for plain error alone. *See, e.g., United States v. Williams, supra*, 272 F.3d at 854-55.

The district judge certainly committed no plain error in declining to recuse himself. As the government points out, the Constitution demands recusal in a narrower range of circumstances than does the statute. Generally speaking, due process compels recusal only when "the [biasing] influence . . . is so strong that [the court] may presume actual bias." *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1375 (7th Cir. 1994) (en banc), *cert. denied*, 514 U.S. 1037, 115 S. Ct. 1404 (1995). Conflicts arising from the judge's familial relationships normally do not mandate recusal under the due process clause. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S. Ct. 1580, 1584 (1986). Here, no basis has been shown for believing that the work and social life of the judge's daughter gave rise to a disqualifying bias on the part of the judge. Her report for the Chicago Crime Commission concerned neither the defendants, the Traveling Vice Lords, nor the facts of this case, and the judge himself had not even read the report. Likewise, the DEA agent whom she was dating had no involvement in this case, and the judge had not discussed the case with him.

O.  Supervisory Enhancement for Cox

Pursuant to section 3B1.1(b) of the Sentencing Guidelines, the district court determined that Cox qualified as a "manager or supervisor" of criminal activity that "involved five or more participants or was otherwise extensive" and enhanced his offense level by three levels. R. 730, Cox Sentencing Tr. 26-29. The court had no doubt that the

criminal activity at issue in this case involved at least five individuals or was otherwise extensive: the conspiracy had a broad temporal and geographic reach and was responsible for numerous narcotics transactions that took place on a daily basis. *Id.* at 27. As for Cox's role in that conspiracy, the court noted that Cox had told Cronin upon his arrest that he controlled the distribution of narcotics within an eight or nine square-block portion of the TVL domain and that he could "shut down" other TVL members who were selling drugs within that area. *Id.* at 27-29. The court noted further that Cox's management of at least one "drug spot" required him to employ several individuals who could sell drugs, transport money and drugs, and secure the "spot." *Id.* at 29. These facts, the district court reasoned, supported the inference that Cox had managed or supervised one or more participants in the charged conspiracy. *Id.* at 27, 29. The court did not name any such participant, however, *see id.* at 29, and this forms the basis for Cox's objection to the managerial enhancement. Unless the district court can identify by name at least one person whom the defendant supervised or managed, Cox argues, it cannot impose the enhancement. *See United States v. Stubbs*, 11 F.3d 632, 641 (6th Cir. 1993) (holding that section 3B1.1 requires the district court to "make specific findings as to the identity of the persons involved in the criminal enterprise"); *but see also United States v. Fells*, 920 F.2d 1179, 1182 (4th Cir. 1990) (lower-level distributors with whom defendant supplied crack cocaine were properly considered by district court in imposing section 3B1.1 enhancement although not identified by name), *cert. denied*, 501 U.S. 1219, 111 S. Ct. 2831 (1991); *United States v. McDowell*, 918 F.2d 1004, 1011 (1st Cir. 1990) (identities of participants in crime need not be proved expressly for purposes of section 3B1.1, although district court must make finding that "pinpoints them with enough particularity to give credence to the upward adjustment"); *United States v. Barbontin*, 907 F.2d 1494, 1498 (5th Cir. 1990) (identities of participants need

not be proved expressly for purposes of section 3B1.1). This argument poses a legal issue as to which our review is de novo. *See United States v. Tai*, 41 F.3d 1170, 1174 (7th Cir. 1994).

We do not agree that a court must invariably identify *by name* the person or persons whom the defendant managed or supervised, however. Our opinion in *United States v. Schweihs*, 971 F.2d 1302, 1318 (7th Cir. 1992), does indicate that the district court must identify each of the participants in the criminal enterprise when imposing a section 3B1.1 enhancement. In the absence of such a finding, we cannot exercise meaningful review of the court's threshold determination that there were at least five criminally culpable participants in the offense or its ultimate determination that the defendant managed or supervised one or more of these participants. *United States v. Jewel*, 947 F.2d 224, 235-36 (7th Cir. 1991); *see also McDowell*, 918 F.2d at 1011-12. Yet, in some cases, the evidence may leave no doubt that the defendant directed another culpable participant but may not reveal that person's name. In *United States v. Richards*, 198 F.3d 1029, 1031 (7th Cir. 2000), for example, an unnamed individual had met the defendant and escorted him and his confederates in narcotics trafficking to a "safe house"; and another such unnamed individual had retrieved his minivan and later returned it to him loaded with marijuana. We indicated that the district court could properly consider those individuals as participants in the criminal enterprise over whom the defendant had exercised control, notwithstanding the absence of evidence as to their names. *Id.* at 1034. *See also United States v. Cadavid*, 192 F.3d 230, 237 (1st Cir. 1999) (evidence that conspiracy involved four named individuals and two unnamed individuals sufficient to support district court's determination that the enterprise involved five or more participants); *Fells*, 920 F.2d at 1182-83 (evidence that defendant's narcotics distribution network involved four named participants and seventeen unnamed, lower-level distributors was sufficient

to support district court's finding that the enterprise involved five or more participants). So long as the court's findings and the underlying evidence make clear that the criminal enterprise involved at least five culpable participants and that the defendant actually did manage or supervise one or more of these individuals, the lack of evidence as to the name of the person that the defendant supervised or managed should not foreclose imposition of the managerial enhancement pursuant to section 3B1.1(b). In this case, the district court pointed to specific evidence indicating that Cox had managed or supervised other criminally culpable participants in the TVL's narcotics operations. But for the fact that the evidence does not reflect the names of these individuals, Cox makes no challenge to the sufficiency of this evidence or the district court's findings. We find no error in the district court's decision.

P.   Choice's Offense Level

The district court made several factual determinations that increased Choice's offense level and, ultimately, mandated a prison term of life. First, in establishing Choice's base offense level, the court determined that Choice should be held to account for the full amount of cocaine distributed by the members of the conspiracy—more than 150 kilograms—in view of Choice's "full participation in the conspiracy." R. 748, Choice Sentencing Tr. 18; *see also id.* at 16-18, 19-20. Second, although the evidence did not indicate that Choice himself had possessed a firearm in connection with the conspiracy, the court increased Choice's base offense level by two levels based on the fact that his co-conspirators had done so. *Id.* at 18-19, 20; *see* U.S.S.G. § 2D1.1(b)(1). Finally, as with Cox, the court increased Choice's offense level by another three levels based on Choice's exercise of managerial or supervisory authority over certain aspects of the conspiracy, including the distribution of heroin at the Henry Horner Homes, a public housing project on Chicago's

west side. R. 748, Choice Sentencing Tr. 20; *see* U.S.S.G. § 3B1.1(b). Choice challenges each of these findings, which we review for clear error. *E.g.*, *United States v. Kroledge*, 201 F.3d 900, 905 (7th Cir. 2000). None of these three factual determinations was clearly erroneous.

For purposes of establishing the defendant's offense level, the relevant drug quantity need not be proven beyond a reasonable doubt, as Choice contends, so long as the resulting sentence is within the range of penalties proscribed in the statute. *E.g.*, *United States v. Hernandez*, 226 F.3d 839, 841-42 (7th Cir. 2000). In this case, the statute specified a prison term of twenty years to life so long as the offense involved at least five kilograms of cocaine and/or one kilogram of heroin. 21 U.S.C. § 841(b)(1)(A)(i, ii). The jury was not asked to find beyond a reasonable doubt whether the conspiracy involved at least this much cocaine, and as we have discussed, that constituted an error under *Apprendi*. *See supra* at 29-30. But we have already held this error to be harmless in view of the overwhelming evidence that the conspiracy involved far more than the threshold quantities of five kilograms of cocaine and one kilogram of heroin. *See supra* at 30-31. For purposes of determining where within the statutory range of twenty years to life Choice was to be sentenced, the district court was free to establish the relevant drug quantity based on a preponderance of evidence. *E.g.*, *United States v. Nubour*, 274 F.3d 435, 444 (7th Cir. 2001), *petition for cert. filed*, No. 01-10947 (U.S. June 20, 2002). Choice does not dispute that the district court's 150-kilogram finding has adequate evidentiary support under this burden.

Although Choice secondarily contends that the court erred in holding him responsible for the full amount of cocaine involved in the conspiracy, we find no clear error in that determination. *See, e.g.*, *United States v. Gutierrez-Herrera*, 293 F.3d 373, 376 (7th Cir. 2002). A defendant may be held to account for the full quantity of drugs involved in

a conspiracy to distribute narcotics so long as that amount was reasonably foreseeable to him. U.S.S.G. § 1B1.3(a)(1)(B) & comment. (n.2); *see*, *e.g.*, *United States v. Robbins*, 197 F.3d 829, 850-51 (7th Cir. 1999); *United States v. Flores*, 5 F.3d 1070, 1082-83 (7th Cir. 1993), *cert. denied*, 510 U.S. 1074, 114 S. Ct. 884 (1994). Notwithstanding his protestations of "minimal" involvement in the conspiracy, the evidence revealed that Choice was Young's "right-hand man" and that he enjoyed a position of significant status and authority within the TVL hierarchy as a result. *See*, *e.g.*, Tr. 346, 668, 673, 1228, 1252, 1751-52. The evidence also reveals Choice's personal involvement in a number of multi-kilogram transactions. To cite just a few examples, the evidence indicated that Choice had picked up a ten-kilogram quantity of cocaine from Young on at least one occasion, Tr. 694, that he had delivered cocaine to Leslie Teague on more than ten occasions for Young, Tr. 2096-99, 2105-07, that he had managed the distribution of heroin at the Henry Horner Homes and had picked up heroin from Young for that purpose, Tr. 342-43, 358, and that he was distributing three kilograms of cocaine per week at one point in time, Tr. 1049. The district court was entitled to infer that someone with Choice's degree of involvement could have reasonably foreseen that the conspiracy involved at least 150 kilograms of cocaine (or its equivalent).

For the same reason, we find no error in the district court's decision to apply the firearms enhancement. A defendant convicted of conspiracy need not have possessed a firearm himself for the enhancement to apply, so long as his co-conspirators' possession of firearms in furtherance of the conspiracy was reasonably foreseeable to him. *See*, *e.g.*, *United States v. Cavender*, 228 F.3d 792, 801 (7th Cir. 2000), *cert. denied*, 532 U.S. 1023, 121 S. Ct. 1965 (2001). Firearms were widely used in the TVLs' trafficking operations, *see* Tr. 702, 723-26, 1452-53, 1857-60, and given the extent of Choice's hands-on involvement in those operations, he must have been aware of the presence and use of firearms.

Nor, finally, do we discern any error in the imposition of the managerial enhancement. The evidence revealed not only that Choice ran the heroin distribution at the Henry Horner Homes, *see* Tr. 342-49, 668, which required that he supervise more than one other criminally responsible person, but also that he directly supervised Terry Bronson (nicknamed "Frog"), who helped him pick up and deliver drugs, Tr. 342-43, 350, 353.

Q. Enhancement of Bahman Mansoori's Offense Level for Obstruction of Justice

Based on Bahman Mansoori's refusal to comply with a court order directing him to supply a voice exemplar, the court enhanced his offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1. Not long before the government rested its case-in-chief, Bahman's counsel informed the prosecution that he intended to call an FBI agent to the stand to testify about the government's use of voice exemplars in another case as a means of voice identification. The aim of this testimony, apparently, was to suggest that the FBI's language specialist, Behrooz Sarshar, lacked an adequate basis upon which to identify Bahman's voice on the tape recordings (*see supra* at 43-44) because the government had not used voice exemplars for that purpose. After the defense case had begun and before the agent testified, the government sought to bar this line of inquiry and argument. After the district court overruled the government's objection, Tr. 3941, the government asked the court to order Bahman to provide a voice exemplar, Tr. 3942-45. Bahman objected to the request, and although the court did not definitively rule on the objection at that time, it did point out to Bahman's counsel that "[y]ou are the one that just brought this issue up." Tr. 3945. Later, after the agent testified, the court ordered Bahman to provide an exemplar. Tr. 4015-16, 4387. When Bahman refused, the court permitted the government to elicit evidence of his refusal to

the jury. Tr. 4514-15, 4520-21; *see* Tr. 4687-89. The court observed that Bahman had "opened the door" on this subject and that the court had allowed the agent's testimony on the condition that Bahman would supply the government with an exemplar. Tr. 4520. At sentencing, the court determined that an enhancement for obstruction of justice was appropriate in light of Bahman's refusal to comply with the court's order. R. 601, B. Mansoori Sentencing Tr.17-18. We review that determination for clear error. *E.g.*, *United States v. Yusufu*, 63 F.3d 505, 514 (7th Cir.), *cert. denied*, 516 U.S. 1015, 116 S. Ct. 578 (1995).

The district court did not clearly error in imposing the obstruction enhancement. We have previously upheld such an enhancement based on the defendant's refusal to provide a handwriting exemplar. *United States v. Ruth*, 65 F.3d 599, 608 (7th Cir. 1995), *cert. denied*, 517 U.S. 1158, 116 S. Ct. 1548 (1996). Bahman's objection is premised on the notion that the government deprived him of due process by waiting until he had already commenced his defense to make its request for a voice exemplar—thus putting him to an untenable choice between submitting a potentially incriminating exemplar or making himself subject to a sentence increase for obstruction of justice by refusing to submit the exemplar. Bahman Mansoori Suppl. Br. at 9-11. But the record does not bear out Bahman's argument. The government requested the exemplar only after the court overruled its objection to the FBI agent's testimony, but also before Bahman put the FBI agent on the witness stand. Moreover, although the district court may not yet have definitively said that it would order the exemplar, it had expressed the view that Bahman was opening the door to that request by putting on testimony that called into question the reliability of the voice identifications. Tr. 3943, 3945, 4226; *see also* Tr. 4015-16. In short, before he called the FBI agent to testify about the use of voice exemplars in another case, Bahman knew that it was altogether possible the court would order him to submit an exemplar of his

own. In no sense was he "set up" by the government or by the district court. The district court acted within its discretion in ordering him to submit the exemplar, *see, e.g.*, *United States v. Rogers*, 475 F.2d 821, 825-26 (7th Cir. 1973), and given Bahman's refusal to comply with that order, the court committed no clear error in enhancing his offense level for obstruction of justice, *Ruth*, 65 F.3d at 608.

R.  Denial of Young's Request for Downward Departure Without Evidentiary Hearing

Prior to sentencing, Young filed a motion asking the court to depart downward from the otherwise applicable sentencing range on three grounds: (1) his diminished mental capacity, *see* U.S.S.G. § 5K2.13, (2) his mental condition, *see id.* § 5H1.3, and (3) his prior good works, *see id.* § 5H1.11. The district court determined that Young was ineligible for a departure on the basis of diminished mental capacity because he had not been convicted of a non-violent offense, as section 5K2.13 requires. *United States v. Young*, 1999 WL 731790, at *1-*3 (N.D. Ill. Aug. 31, 1999). This was a legal determination that we review de novo. *United States v. Poff*, 926 F.2d 588, 590-91 (7th Cir.) (en banc), *cert. denied*, 502 U.S. 827, 112 S. Ct. 96 (1991). With respect to his mental condition, the court indicated that Young had not articulated exceptional circumstances that might warrant a departure. Accordingly, the court summarily denied his request without holding an evidentiary hearing. 1999 WL 731790, at *3-*4. We review the district court's decision not to hold an evidentiary hearing for abuse of discretion. *See* Fed. R. Crim. P. 32(c)(1); *United States v. Beltran*, 109 F.3d 365, 369 (7th Cir.), *cert. denied*, 522 U.S. 852, 118 S. Ct. 145 (1997). Finally, the court denied Young's request for a departure on the basis of his good works on the merits, after hearing testimony regarding those works. R. 745-3, Young Sentencing Tr. 39-42. Of course, we lack jurisdiction to review a district court's discretionary decision not to

depart downward, *e.g.*, *United States v. Schuh*, 289 F.3d 968, 974 (7th Cir. 2002), and indeed, Young does not challenge that decision.

We turn to the requested diminished capacity departure first. The district court sentenced Young using the 1997 version of the Sentencing Guidelines. *See Young*, 1999 WL 731790, at *1. As of 1997, section 5K2.13 provided as follows:

> If the defendant committed *a non-violent offense* while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K2.13 (1997) (emphasis supplied). The Guideline offered no guidance as to what constitutes a "violent" as opposed to a "non-violent" offense. In *Poff*, 926 F.2d 588, we held by a divided (6 to 5) vote that this determination must be made with reference to the definition of "crime of violence" set forth in the career offender guideline, section 4B1.2(a).[12] That guideline, which tracks the language of the Armed Career Criminal Act, 18 U.S.C. § 924(e), provides:

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

---

[12] The career offender guideline, section 4B1.1, mandates a prison term at or near the statutory maximum for adults who stand convicted of "a felony that is either a crime of violence or a controlled substance offense" and whose criminal history includes at least two prior felony convictions for the same types of crimes. Section 4B1.2(a) in turn defines "crime of violence" as that term is used in section 4B1.1.

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

We reasoned in *Poff* that the terms "crime of violence" and "non-violent offense" are mutually exclusive, such that any offense that amounts to a "crime of violence" under the criteria set out in section 4B1.2(a) *cannot* be a "non-violent offense" for purposes of section 5K2.13. 926 F.3d at 591-93; *cf. id.* at 594-95 (Easterbrook, J., dissenting). Under *Poff*, then, a conviction for any crime that (i) is defined in such a way as to include the actual, attempted, or threatened use of force, or (ii) constitutes burglary of a dwelling, arson, or extortion, or involves the use of explosives, or (iii) "presents a serious potential risk of physical injury to another," will preclude a departure for diminished mental capacity. This is a categorical approach that abjures any inquiry into whether the defendant actually engaged in violence in committing the offense and focuses instead on the nature of the offense. *Compare id.* at 593 (majority) with *id.* at 594-95 (dissent); *see United States v. Sullivan*, 75 F.3d 297, 300 & n.1 (7th Cir. 1996); *see also United States v. Dailey*, 24 F.3d 1323, 1325-27 (11th Cir. 1994); *United States v. Mayotte*, 76 F.3d 887, 889 (8th Cir. 1996); *United States v. Borrayo*, 898 F.2d 91, 94 (9th Cir. 1989); *United States v. Maddalena*, 893 F.2d 815, 819 (6th Cir. 1989), *cert. denied*, 502 U.S. 882, 112 S. Ct. 233 (1991); *contra United States v. Weddle*, 30 F.3d 532, 540 (4th Cir. 1994) (conviction for offense that meets section 4B1.2's criteria for "crime of violence" may nonetheless qualify as "non-violent offense" for purposes of section 5K2.13); *United States v. Chatman*, 986 F.2d 1446, 1450

(D.C. Cir. 1993) (same).[13]

---

[13] Effective November 1, 1998, the Sentencing Commission amended section 5K2.13 in order to make clear that the sentencing judge is to examine the circumstances underlying the defendant's offense in order to decide whether he qualifies for a diminished capacity reduction rather than make a categorical determination whether the offense was "violent" or "nonviolent". *See* U.S.S.G. App. C., amend. 583. The amended guideline now permits a downward departure unless:

> (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) *the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence*; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.

U.S.S.G. § 5K2.13 (Nov. 1998) (emphasis added). In explaining the revision, the Commission noted the division among the circuits as to the appropriate means of deciding whether the defendant's offense was "nonviolent" and remarked that "[t]he amendment replaces the current policy statement with a new provision that essentially represents a compromise approach to the circuit conflict." U.S.S.G. App. C, amend 583, comment.

Although the revised version of section 5K2.13 took effect well in advance of Young's sentencing, the parties agreed the 1997 version of the Guidelines should be used to sentence Young as the November 1998 version was less favorable to him and consequently created the potential for a violation of his rights under the *ex post facto* clause of the Constitution. *See* U.S.S.G. § 1B1.11(b)(1); *United States v. Schaefer*, 291 F.3d 932, 936 n.1 (7th Cir. 2002); *United States v. Kosmel*, 272 F.3d 501, 507 (7th Cir. 2001). Judge Lindberg therefore applied the 1997 version of section 5K2.13. *See Young*, 1999 WL 731790, at *1. Neither Young nor the government suggests on appeal that we should apply the revised version of the Guideline. Accordingly, we need not decide whether the Commission's revision was "clarifying" (in which case it would apply to pending cases) or "substantive" (in which case it

(continued...)

The offenses of which Young was convicted—narcotics conspiracy, possession of cocaine with the intent to distribute, and money laundering—do not have elements involving the actual, attempted, or threatened use of force, *see* section 4B1.2(a)(1), nor do they fall into one of the categories of offenses expressly identified as violent in section 4B1.2(a)(2) (burglary of a dwelling, arson, etc.). Therefore, only if these offenses may be said to "involve[ ] conduct that presents a serious potential risk of physical injury to another" may they be labeled violent crimes that preclude a downward departure under section 5K2.13.

Notably, the career offender guideline does not permit a free-ranging exploration of the facts underlying and surrounding a defendant's conviction in order to make this determination. The commentary instead explains that "the offense of conviction (*i.e.*, the conduct of which the defendant was convicted) is the focus of inquiry," U.S.S.G. § 4B1.2, comment. (n.2), and it specifically directs the sentencing court to examine "the conduct set forth (*i.e.*, expressly charged) in the count of which the defendant was convicted" and consider whether that conduct, "by its nature" posed a serious risk of injury, *id.* (n.1). *See United States v. Shannon*, 110 F.3d 382, 384 (7th Cir.) (en banc),

---

[13] (...continued)
would not apply). *See* U.S.S.G. § 1B1.11(b)(2) (court should consider guideline amendments made subsequent to defendant's offense "to the extent that such amendments are clarifying rather than substantive changes"); *see also*, *e.g.*, *United States v. Hartz*, 296 F.3d 595, 598-99 (7th Cir. 2002); *United States v. Minneman*, 143 F.3d 274, 282 (7th Cir. 1998), *cert. denied*, 526 U.S. 1006, 119 S. Ct. 1145 (1999); *compare United States v. Askari*, 159 F.3d 774, 779-80 (3rd Cir. 1998) (en banc) (relying on the parties' agreement that the revision to section 5K2.13 was clarifying), *with United States v. Allen*, 181 F.3d 104 (6th Cir. 1999) (unpublished), text in Westlaw, 1999 WL 282674, at *2 (holding that the revision to section 5K2.13 was substantive).

*cert. denied*, 522 U.S. 888, 118 S. Ct. 223 (1997); *United States v. Hoults*, 240 F.3d 647, 650-52 (7th Cir. 2001); *United States v. Lee*, 22 F.3d 736, 738-40 (7th Cir. 1994); *see also Taylor v. United States*, 495 U.S. 575, 600-02, 110 S. Ct. 2143, 2159-60 (1990) (construing comparable language in Armed Career Criminal Act, 18 U.S.C. § 924(e)).

Looking to the language of the indictment in this case, Judge Lindberg concluded that the narcotics charges against Young presented a serious risk of potential injury to others, thus foreclosing the possibility of a downward departure for diminished mental capacity. Count One of the superseding indictment, which set forth the narcotics conspiracy charge against Young and his co-defendants, specifically alleged:

> It was further part of the conspiracy that defendants Terry Young [and others] . . . assisted each other in the distribution of narcotics by using street gang affiliation, violence, and the threat of violence to minimize competition in and otherwise maintain control over these geographic areas, and on occasion by assisting each other in stealing narcotics from other narcotics distributors.

1999 WL 731790, at *2, quoting R. 133 at 3 ¶ 4. Judge Lindberg found this allegation sufficient to establish that Young's convictions were for "crimes of violence" as section 4B1.2(a)(2) defines such offenses. *Id.* He observed:

> Drug dealing, especially at the scale involved here, is far from a benign activity. Squabbles over turf and stealing from other drug distributors are quite common and are, *inter alia*, a rich source of violence. Trial testimony amply demonstrated that defendant's drug operation was no exception. . . .

*Id.*

Young argued below, and renews the argument here, that although the sentencing court may look to the language of

the indictment to determine whether a particular offense amounted to a violent crime, it must confine its consideration to those allegations that were necessary to charge the offense of conviction. The mere fact that violent acts were alleged in the indictment is not enough, in Young's view, to confirm that the defendant was convicted of a violent offense; only if such facts were essential to the conviction may the sentencing judge consider them.

Young's argument has the support of a number of career offender cases, which indeed emphasize that when review of the charging document is necessary in order to assess the nature of a defendant's prior conviction, the court should focus solely on allegations that were essential to the conviction. *See*, *e.g.*, *United States v. Jackson*, 177 F.3d 628, 632 (7th Cir. 1999) ("By considering only the minimum facts necessary to support Jackson's conviction, we can ensure that we impose a sentence enhancement only for conduct of which Jackson was actually convicted."); *see also United States v. Winter*, 22 F.3d 15, 19 (1st Cir. 1994) (when examining charge underlying prior conviction, "the court should not plunge into the details of a particular defendant's conduct but, rather, . . . should merely assess the nature and object of the [charged offense] as described in the indictment and fleshed out in the jury instructions"). These cases suggest that an indictment's allegations of violence are relevant for purposes of the career offender guideline only if those allegations go to the heart of the charged offense. With respect to a conspiracy conviction, for example, an allegation that the defendant conspired to commit murder obviously would be relevant in the sense that it revealed the very object of the conspiracy; and one could confidently read into the conviction a finding that the defendant had conspired to commit a violent act. *See United States v. Fiore*, 983 F.2d 1, 3 (1st Cir. 1992), *cert. denied*, 507 U.S. 1024, 113 S. Ct. 1830 (1993). Likewise, with respect to a racketeering conviction, an allegation that the defendant engaged in predicate acts of extortion and arson would be

probative of the nature of the racketeering; and once again, the conviction on an indictment containing that allegation would stand as proof that the defendant had engaged in violent conduct. *See Winter*, 22 F.3d at 19-20. By contrast, in a check-kiting case, an allegation that the defendant engaged in a violent act would be entirely beside the point, as the use of violence has nothing whatever to do with the elements of check kiting, and conviction on the charge would in no way depend upon proof of violence nor reflect a finding that such violence had occurred. *See id.* at 19-20, 20-21; *but see Shannon*, 110 F.3d at 387 ("it is common ground between the parties that in deciding just what the defendant's offense was we are free to look at the facts charged in the indictment or information; we are not confined to the minimum conduct that would create the offense").

Thus, the fact that the indictment in this case alleged the use of violence and threats of violence does not necessarily establish that any of the charges on which the jury convicted Young were crimes of violence. An indictment may allege any number of facts which, although illuminating in a contextual sense, are by no means necessary to establish that the defendant committed the crime charged. *See United States v. Ewings*, 936 F.2d 903, 905-06 (7th Cir. 1991) (merely because extraneous facts are alleged in indictment does not render proof of those facts relevant and admissible at trial).

The alleged acts of violence on which the district court relied here appear to fall into that category of collateral facts. Proof that violence was used or threatened was wholly unnecessary to establish that Young conspired to distribute narcotics, or for that matter, that he possessed narcotics with the intent to distribute and laundered money. The violence allegation speaks neither to the central object nor the essential nature of the charged crimes. Moreover, as the jury instructions reveal, the jury

was not directed that Young's guilt on the narcotics or money-laundering charges in any way depended on a finding that he or his co-defendants had engaged in violent acts. *See* Tr. 5330-33 (conspiracy), 5333-35 (distribution of a controlled substance), 5337-40 (money laundering). Consequently, although the indictment alleged that the charged offenses involved violence or the threat of violence, one cannot read into Young's convictions on these charges a finding that he engaged in violent conduct. *See Jackson*, 177 F.3d at 632. Therefore, pursuant to the categorical assessment of the defendant's convictions that *Poff* requires, none of Young's convictions can be considered crimes of violence that precluded the district court from entertaining a departure under section 5K2.13.

We must, therefore, remand so that Judge Lindberg may consider anew whether Young's allegedly diminished mental capacity calls for a downward departure. *See*, *e.g.*, *United States v. Jaroszenko*, 92 F.3d 486, 491 (7th Cir. 1996). We hasten to add that the judge is by no means precluded from considering the extent to which Young and his co-conspirators employed violence in furtherance of their crimes—along with any other pertinent factors—in making that determination. (The guideline itself indicates that a departure may not be granted to the extent that the defendant's criminal history reveals a need for incarceration to protect the public, for example.) We have concluded only that Young's convictions for conspiring to distribute narcotics, distributing a controlled substance, and money laundering do not constitute violent offenses that categorically disqualify Young for a departure under section 5K2.13. As it otherwise considers the propriety of a departure, however, the court need not blind itself to the circumstances underlying his offenses. *Cf. United States v. Purchess*, 107 F.3d 1261, 1271-72 (7th Cir. 1997) (court may depart upward on the basis of relevant conduct).

With respect to Young's request for a downward departure based on his mental condition, *see* § 5H1.3, which is a

disfavored ground for departure, we conclude that the district judge did not abuse his discretion in denying the request without conducting an evidentiary hearing. The Sentencing Guidelines do not invariably obligate the court to conduct an evidentiary hearing to resolve a contested issue, so long as the sentencing court gives both parties the opportunity to present the information that it needs to decide the matter. U.S.S.G. § 6A1.3(a); *e.g.*, *United States v. Beltran, supra*, 109 F.3d at 369; *see also Sentencing Guidelines*, 88 GEO. L.J. 1483, 1519 n.2052 (2000) (collecting cases). Here, the papers that Young submitted to the court in support of his departure requests were sufficient to apprise the court of his mental condition. In denying the request, Judge Lindberg did not question the veracity of Young's representations; he simply found them insufficient to warrant a departure from the guideline sentencing range. *See* 1999 WL 731790, at *4. Under these circumstances, the judge was not obligated to conduct an evidentiary hearing.

S.  Community Restitution

In controlled substance prosecutions such as this one, in which there is no identifiable victim of the offense, 18 U.S.C. § 3663(c) permits the sentencing judge to order the payment of restitution commensurate with the public harm caused by the crime. However, section 3663(c)(2)(B) further provides that the amount of restitution ordered in such a case shall not exceed the amount of the fine imposed for the offense. The district court ordered both Young and Cox to pay community restitution. *See* R. 730, Cox Sentencing Tr. 31-32, and R. 682; R. 745-3, Young Sentencing Tr. 47, and R. 681. However, because the court did not order either of them to pay a fine, they contend that the restitution order was plainly erroneous. The government concedes the error, and in view of the unequivocal terms of section 3663(c)(2)(B), we agree that the restitution obligations imposed on

Young and Cox were plainly erroneous. It appears that the court made the same error with respect to the other defendants as well. *See* R. 748, Choice Sentencing Tr. 21-22, and R. 691; R. 601, B. Mansoori Sentencing Tr. 51, and R. 569; R. 690 (M. Mansoori). We therefore vacate and remand the sentences of all defendants for correction of that error.

### III.

For all of the foregoing reasons, we AFFIRM the defendants' convictions but VACATE their sentences and REMAND for re-sentencing in accordance with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*